UNITED STATES of America

v.

Carlton E. BRYANT, Appellant.

UNITED STATES of America

v.

William E. TURNER, Appellant.

Nos. 23957, 24105.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 26, 1970.

Decided Jan. 29, 1971.

McGowan, Circuit Judge, concurred
and filed an opinion.

Mr. Nicholas A. Addams, Washington, D. C., for appellant in No. 23,957.

Mr. David Applestein, Washington, D. C. (appointed by this court), for appellant in No. 24,105.

Mr. Brian W. Shaughnessy, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Before WRIGHT and McGOWAN, Circuit Judges, and JOHNSON,* Chief Judge, United States District Court for the Middle District of Alabama.

J. SKELLY WRIGHT, Circuit Judge:

These cases point up an anomaly of our criminal process: controlled by rules of law protecting adversary rights and procedures at some stages, the process at other stages is thoroughly unstructured. Beside the carefully safeguarded fairness of the courtroom is a dark no-man's-land of unreviewed bureaucratic and discretionary decision making. Too often, what the process purports to secure in its formal stages can be subverted or diluted in its more informal stages. That, we are told, is what happened here.

The right at stake in the cases before us is defendant's discovery of evidence gathered by the Government, evidence whose disclosure to defense counsel would make the trial more a "quest for truth" than a "sporting event." [1] This safeguard of a fair trial is surely an important one; but here it was undercut at the pretrial period by bureaucratic procedures and/or discretionary decisions of Government investigative agents who made no effort to preserve discoverable material. When defense motions for discovery were made, it turned out that the material was unaccountably "lost." The issue presented is whether intentional non-preservation by investigators—as opposed to bad faith destruction or prosecutorial withholding —of discoverable evidence amounts to its illegal suppression. [2] Although we remand these cases for a further hearing on the investigators' conduct, we require rigorous procedures to govern preservation of such evidence by federal investigative agencies, including the District of Columbia police, in the future.

I

Appellants Bryant and Turner, with Herbert Johnson whose case is not now on appeal, were convicted of offenses involving the sale of a substantial quantity of heroin. The sale was negotiated and concluded with John Pope, an undercover agent of the Bureau of Narcotics and Dangerous Drugs normally stationed in Detroit but flown to Washington, D. C. for the occasion. At appellants' trial,

---

* Sitting by designation pursuant to 28 U.S. C. § 292(c) (1964).

1. Brennan, The Criminal Prosecution: Sporting Event or Quest for Truth?, 1963 Wash.U.L.Q. 279.

2. Appellants raised several other issues in their briefs: claims of illegal electronic surveillance, improper joinder, lack of speedy trial, and numerous errors committed during trial involving the prosecution's opening statement, references to the defendants by nicknames, proof of the chain of custody of the heroin sold, and the instructions to the jury. We have reviewed these claims and conclude that they lack merit.

As to the legality of the electronic surveillance, we note that the Government agents acted with the "consent" of the undercover agent whose conversations with appellants were bugged. Warrantless consent eavesdropping has been permitted by the Supreme Court, see Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), and recently has been approved by Congress in 18 U.S.C. § 2511(2) (c) (Supp. V 1965–1969). Appellants suggest that the broad preference for warrants indicated in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), may lead the Supreme Court to reverse itself on this issue. But the Court itself now has the question before it, United States v. White, 7 Cir., 405 F.2d 838, cert. granted, 394 U.S. 957, 89 S.Ct. 1305, 22 L.Ed.2d 559 (1969), set for reargument, 396 U.S. 1035, 90 S.Ct. 677, 24 L.Ed.2d 679 (1970), and we must await its decision, relying in the meantime on Lopez.

Agent Pope was the principal witness for the prosecution. His testimony was largely an account of conversations with the three defendants leading up to and following the actual transfer of the drug.

Agent Pope's story, in its bare essentials, was as follows: After arriving in Washington, he took a room at a Holiday Inn and contacted Johnson who expressed an interest in doing "some business." Later that evening Johnson, accompanied by others not indicted as co-defendants, visited the motel room. A general discussion of prices and quantities of heroin ensued; and Johnson said he would return the next day with "his man," "his source of supply," in order to make more specific arrangements. Around noon on the following day, Johnson and appellant Bryant came to see Agent Pope at the motel. Bryant and Agent Pope immediately commenced negotiations. After several minutes' discussion, Bryant "okayed" the sale of a particular quantity of heroin at a particular price and left. Johnson lingered to tell Agent Pope that he would return later to make the transfer. Again true to his word, Johnson came to the motel room that evening, accompanied this time by appellant Turner whom he introduced as his "runner." The trio had a general conversation about the narcotics business in which Turner took active part. They then left for Johnson's house to pick up the heroin. Johnson and Turner measured out a quantity of the drug and then the three men again returned to the motel room. There, Agent Pope paid for the heroin and, after another general conversation among the three about future narcotics business they might transact, Johnson and Turner left for the last time.

Without Agent Pope's account of the motel room conversations, the Government would have had almost no evidence against appellant Bryant and a much weaker case against appellant Turner. Its theory was that the appellants aided and abetted in the sale of heroin by Johnson, and the testimony as to the motel conversations was necessary to clarify their roles as active participants. *See* Bailey v. United States, 135 U.S. App.D.C. 95, 416 F.2d 1110 (1969). Besides Agent Pope, the Government presented only two other witnesses: a surveillance agent who had observed the comings and goings outside the motel but knew nothing of where appellants went or what they did once inside, and a chemist who identified the heroin that had been transferred. Appellants did not testify. Thus it was that the credibility of Agent Pope's story became the key to conviction.

Such need not have been the case. For this was no shoestring investigative operation on the part of the Bureau; it was a major effort involving many agents and careful precautions. Agent Pope was not alone in the Holiday Inn. In the room next to his were other agents who had bored a hole in the connecting wall and were not only listening in on the crucial conversations, but were also recording them on a tape recorder. There can be little if any doubt that that tape would have been more reliable than Agent Pope's recollection as evidence of what appellants' roles in the heroin sale actually were. Agent Pope testified that he took no notes on the conversations until after they were over, and even then he made only very sketchy notes on his hand and on scraps of paper. He did not prepare a full report until he had returned to Detroit as much as one to four days later. The trial occurred a full year after the conversations and sale took place. Even assuming absolute good faith on Agent Pope's part, there was amply sufficient occasion to forget or inaccurately reconstruct what went on. Although the agent's report was turned over to appellants at trial, it could hardly substitute for the tape and eliminate the possibility of serious prejudice. It is possible, after all, that the tapes might have revealed that there was no discussion whatever of a narcotics deal while appellants were in the motel room or that they in no way participated in the conversations. More probably, the tape might have clarified

the context in which certain remarks were made or corrected other matters of emphasis and degree in Agent Pope's testimony.

When defense counsel heard rumors of the tape's existence, they recognized its obvious importance and made repeated efforts to discover it. At each juncture their efforts were frustrated. At the preliminary hearing, almost seven months before trial, the Assistant United States Attorney objected to a question concerning the possible existence of a tape recording, and his objection was sustained. And at a discovery conference three months later he stated that he knew of no tape, but would inform defense counsel if one came to his attention. Indeed, although the prosecution had long been on notice of defendants' interest in the tape, it was not until a few days before the trial that the Assistant United States Attorney told defense counsel that a tape had been made but that it had apparently been "lost" somewhere at the Bureau of Narcotics and Dangerous Drugs and had never been turned over to the prosecution. Finally, just before the beginning of the trial, a hearing was held on a defense motion to discover the tape or, alternatively, to dismiss the indictment. At that hearing, Agent Warden—the Bureau agent in charge of the taping—testified as to the circumstances of the tape's recording and loss. The motion was denied by the trial judge, but Agent Warden's testimony set the stage for this appeal.

Warden's recollection of most relevant matters was extraordinarily vague. He constantly qualified his statements with "possibly" or "probably" or simply settled for "I don't know." He was clear on only a few facts. After the agents left the Holiday Inn, Agent Warden brought the tape to his office at the Bureau and some time soon thereafter played it back. Apparently the quality of the recording was adequate, since Warden testified that he could hear the conversation and could identify the speakers. Yet he was unsure whether he asked any of his colleagues—even Agent Pope—to listen to the tape. And it was not long before the tape seems to have disappeared; Agent Warden did not recall when he last saw it. He did not inform the Assistant United States Attorney about the tape until approximately ten months later, two months before the trial. When he was asked to look for it, he checked his desk and his personal safe, but to no avail.

The agent was unequivocal on one other matter—indeed, the most crucial matter to this appeal. He made no pretense of having had any intention to preserve the tape. Rather, he stated flatly that he made *no* effort to preserve it. He testified that when Bureau agents make a tape which they intend to save for use in prosecution they take the following steps to see that it is preserved: "It would have been marked in the front of the tape, the nature of the conversations. There would have been my name placed on there, the date, time, and if it was to be used as evidence of some kind, it would have been kept in a locked safe." But in this case:

Q You didn't mark, at all, the place, the time, the occurrence?

A No, I didn't mark it.

Q Well, above and beyond the use in court, isn't this just standard operating procedure, to at least mark a tape of conversation, with the date, the time, the people involved?

A If you want to keep the tape, you do. There wasn't a need to keep the tape, and it wasn't so marked, that I know of.

Agent Warden testified further that in making his decision not to preserve the tape he was not guided by his superiors in the Bureau, nor did he contact the United States Attorney's office. He had never intended the tape to be used as evidence at trial, he said,[3] and he appar-

3. Agent Warden testified that the purpose of the surveillance was strictly "protec- tive"—to see that no harm came to Agent Pope. If that was so, one may

ently felt justified in taking that matter into his own hands. Only if an outside informant, rather than a Bureau agent, had been involved in buying the narcotics, he continued, would he have preserved the recording so as to make it available to the trial counsel and to the jury.

It is important to recognize that this is not a case of a good faith effort to preserve highly relevant evidence, frustrated only by inadvertent loss. Rather, it is a case of intentional non-preservation by an investigative official. On a spectrum between good faith but inadvertent loss and bad faith destruction, Agent Warden's conduct must lie somewhere in the middle. Perhaps it should lie somewhat closer to the latter end. For, despite the overriding vagueness of Agent Warden's testimony, there is at the very least a hint of bad faith in the record. A highly disturbing element of the agent's conduct is his apparent reluctance to let even the United States Attorney's office know that a tape recording had ever been made. When the defense called Agent Warden as a witness at trial, he testified concerning the report he filed with the prosecutor:

Q And this report is detailed in that it sets forth everything that happened minute by minute so far as the actions of yourself, Agent Pope and the other agents who were involved in the investigation; correct, sir?

A That's correct.

Q Indicating the trucks that were rented, the walkie-talkies that were used and all the other electronic equipment that was used in this case?

A It was complete.

Q It is complete except nowhere in the report does it indicate you had a tape recorder monitoring all the con-

versation that was going on in Room 607 on the 30th or the 31st?

A That wasn't in there—

\* \* \* \* \* \*

Q It is detailed with everything except that; is that correct, sir?

A There is no mention in there of it, no, sir.

At issue, then, are the legal consequences of intentional non-preservation by investigative officials of highly relevant evidence, colored by clear reluctance even to admit that the evidence ever existed at all.

II

Access by defense counsel to certain evidence gathered by the Government is protected by both constitutional and statutory safeguards in the federal criminal process. A series of Supreme Court decisions, most particularly Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), creates a due process requirement that certain materials be disclosed to the defense;[4] and Rule 16, Federal Rules of Criminal Procedure, and the Jencks Act,[5] respectively, deal with pretrial and at-trial disclosure of certain material. The threshold issue in these cases is whether the particular material sought to be discovered by appellants—the tape of the motel room conversations—was the type covered by the constitutional and statutory safeguards invoked by appellants. We conclude that it was.

In the leading Supreme Court decisions concerning the due process requirement of disclosure, the content of the non-disclosed evidence has always been known. The standard of constitutional coverage thus has turned upon the extent to which the evidence is "favor-

wonder why tape recording was necessary at all since Warden was listening with earphones as well as recording.

4. *See also* Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967); Napue v. Illinois, 360 U.S. 264, 79 S.Ct.

1173, 3 L.Ed.2d 1217 (1959); Alcorta v. Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed. 2d 9 (1957); Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

5. 18 U.S.C. § 3500 (1964).

able" to the accused.[6] Although the Supreme Court has not yet attempted to define this standard with precision,[7] it is the law in this circuit that the due process requirement applies to all evidence which "might have led the jury to entertain a reasonable doubt about [defendants'] guilt,"[8] and that this test is to be applied generously to the accused when there is "substantial room for doubt" as to what effect disclosure might have had.[9]

■■ But in these cases we are entirely in the dark. We have no idea what may have been on the tape. For all we know, the tape would have corroborated Agent Pope's story perfectly; or, for all we know, it might have completely undercut the Government's case.[10] There is not simply "substantial room for doubt," but room for nothing except doubt as to the effect of disclosure. What we do know is that the conversations recorded on the tape were absolutely crucial to the question of appellants' guilt or innocence. That fact, coupled with the unavoidable possibility that the tape might have been signifi-

cantly "favorable" to the accused, is enough to bring these cases within the constitutional concern. If the due process requirement is directed to evidence whose non-disclosure "might" have harmed the accused, its purpose clearly reaches the type of missing evidence at issue here. Were *Brady* and its progeny applicable only when the exact content of the non-disclosed materials was known, the disclosure duty would be an empty promise, easily circumvented by suppression of evidence by means of destruction rather than mere failure to reveal. The purpose of the duty is not simbly to correct an imbalance of advantage, whereby the prosecution may surprise the defense at trial with new evidence; rather, it is also to make of the trial a search for truth informed by all relevant material, much of which, because of imbalance in investigative resources, will be exclusively in the hands of the Government.[11]

■ The statutory safeguards more clearly deal with tape recordings such as the one before us. These safeguards refer not to the probative effect of the evi-

6. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

7. *See* Giles v. Maryland, *supra* Note 4, 386 U.S. at 73–74, 87 S.Ct. at 797 (refusing to reach the issue of "the degree of prejudice which must be shown to make necessary a new trial").

8. Levin v. Katzenbach, 124 U.S.App.D.C. 158, 162, 363 F.2d 287, 291 (1966).

9. Levin v. Clark, 133 U.S.App.D.C. 6, 9, 408 F.2d 1209, 1212 (1967), quoting from Griffin v. United States, 87 U.S. App.D.C. 172, 175, 183 F.2d 990, 993 (1950). This court stated further that the focus of our test is upon "the ultimate possibility of harm to the defendant." It went on to stress the generous manner in which the test is to be applied: "This standard requires speculation because there is no sure way to know how the jury would have viewed any particular piece of evidence. Nor is it possible to know whether revelation of the evidence would have changed the configuration of the trial—whether defense counsel's preparation would have been different had he known about the

evidence, whether new defenses would have been added, whether the emphasis of the old defenses would have shifted. Because the standard requires this kind of speculation we cannot apply it harshly or dogmatically." 133 U.S.App.D.C. at 9, 408 F.2d at 1212.

10. Or the defense might have found the tape useful "in obtaining further evidence," a component of the constitutional analysis recognized in Giles v. Maryland, *supra* Note 4, 386 U.S. at 74, 87 S.Ct. 793.

11. *See* Brady v. Maryland, *supra* Note 6, 373 U.S. at 87–88, 83 S.Ct. 1194. There is some indication that the trial judge failed to recognize this broad purpose behind the disclosure duty. Although he gave no reasons for denying the discovery motions, he did make the following comment: "The important fact is, can the United States Attorney use it [the tape]? Does he have it?" It should now be clear that that is *not* the most important fact; suppression of evidence by investigative officials—no less than by the prosecution—corrupts the truth seeking function of the trial.

dence but to its general nature. Rule 16(a), Fed.R.Crim.P., provides for court ordered discovery of "written or recorded statements or confessions made by the defendant." The tape at issue in these cases was such a "recorded statement." We agree with a leading District Court opinion interpreting the statutory language that "the considerations requiring production of statements knowingly and willingly made, should apply *a fortiori* to * * * remarks furnished unwittingly to the government" through secret electronic recording.[12] Even more than formal statements, surreptitiously recorded "statements" will be difficult for the defendant to reconstruct from memory and will often, as here, be most central to his fate at trial. We agree with a panel of the Second Circuit that "the Notes of the Advisory Committee indicate that the amended Rule was intended to apply even to pre-arrest statements made by a defendant during the course of his crime and was meant to broaden materially the scope of discovery available to a defendant * * *."[13] The Government, moreover, has made no argument for a more niggardly, mechanical interpretation of the word "statements." And none occurs to us.[14] Even if Rule 16(a) were interpreted to apply only to formal statements concerning past occurrences, Rule 16(b) very clearly covers the tape in the cases before us. See United States v. Iovinelli, N.D.Ill., 276 F.Supp. 629, 631–632 (1967). Rule 16 (b) makes discoverable before trial "books, papers, documents, tangible objects, buildings or places, or copies of portions thereof." That this grouping is intended to include recordings of statements is made clear by the further provision in the rule that it "does not authorize the discovery or inspection of * * * statements made by government witnesses or prospective government witnesses (*other than the defendant*) to agents of the government except as provided in 18 U.S.C. § 3500." (Emphasis added.) There would be no reason to include this exception if recordings or transcripts of the words of some individuals were not included in the first place. Since the recording here was of the defendants' conversations, that provision does not preclude their pretrial discovery under Rule 16(b).

The Jencks Act, too, deals with the disclosure of "statements," but by witnesses. It specifically covers a "recording * * * which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral state-

---

12. United States v. Lubomski, N.D.Ill., 277 F.Supp. 713, 721 (1967). In *Lubomski*, as here, the tape recording held discoverable under Rule 16(a) was of a conversation with an undercover agent, which provided direct evidence on the issue of guilt or innocence. *See also* Davis v. United States, 5 Cir., 413 F.2d 1226, 1231 (1969); United States v. Iovinelli, N.D.Ill., 276 F.Supp. 629, 631 (1967); *United States v. Leighton*, S.D.N.Y., 265 F.Supp. 27, 34 (1967).

13. United States v. Crisona, 2 Cir., 416 F.2d 107, 114 (1969). The frequently quoted portion of the Advisory Committee's Notes reads: "The defendant is not required to designate because he may not always be aware that his statements or confessions are being recorded. * * * Discovery of statements and confessions is in line with what the Supreme Court has described as the 'better practice'

(Cicenia v. LaGay, 357 U.S. 504, 511, 78 S.Ct. 1297, 2 L.Ed.2d 1523 (1958))."

14. One other matter regarding Rule 16(a) is worthy of a brief comment. The disclosure duty it establishes is not strictly mandatory; rather, discretion is left with the trial judge. However, "weighty scholarly authority supports the proposition that withholding a defendant's statement should be the exception, not the rule * * *." United States v. Crisona, *supra* Note 13, 416 F.2d at 115, and sources cited therein. Professor Wright has surveyed the cases and concluded that "while the subdivision is cast in discretionary terms it gives the defendant 'virtually an absolute right' to discovery of the materials there listed." 1 C. Wright, Federal Practice and Procedure § 253, p. 500, and cases cited therein. The trial judge's denial of the discovery motion in this case cannot be excused simply as a proper exercise of discretion.

ment." In this context, the Government argues for the narrow reading of the word "statement" which we have rejected under Rule 16(a), citing a Seventh Circuit decision which limits the Jencks Act to "recital[s] of past occurrences" and refuses to extend it to "concurrent tape recording[s] of a conversation * * * [which is] direct evidence relevant on the issue of the alleged guilt of the defendants on trial." [15]

In two cases involving tape recorded conversations between defendants and Government witnesses—as in the cases before us—the Second Circuit has read the Jencks Act to require disclosure of the recording as a "statement" by the witness to "a Government agent" if the taping was directed by Government investigators "to garner evidence" of crime.[16] To decide these cases, however, we need not conclude that the tape of Agent Pope's motel room conversations with appellants, whose recording was directed and performed by other Government agents, fell within the scope of the Jencks Act disclosure requirement—as well as within the overlapping disclosure requirements of the due process clause and of Rule 16. Since the latter apply at the pretrial stage, the Jencks Act issue would not have been reached if the tape had been available and disclosed at that time.

 The fact that it was the Bureau of Narcotics and Dangerous Drugs, and not the United States Attorney's office, which had possession of the tape in these cases does not render it any less discoverable. The duty of disclosure affects not only the prosecutor, but the Government as a whole, including its investigative agencies. Rule 16 and the Jencks Act refer, respectively, to evidence gathered by "the government" and by "the United States," not simply that held by the prosecution. *Brady* did speak of "suppression by the prosecution," [17] but in this context "prosecution" is certainly broad enough to include investigation. In any event, we are confident that the Supreme Court would extend its holding to suppression by investigative agencies. Such suppression must be regulated if the disclosure requirement is to be a strong safeguard; if only the prosecutor were under the command of *Brady,* the right to a fair trial would depend on the uncertain and uncontrolled decisions of Government investigators.

### III

The complicating factor in these cases is, of course, that non-disclosure both before and at trial was due to the tape's "loss" by investigative officials. The issue now facing us is the extent to which the circumstances of the loss absolve the Government of its disclosure duty or alter the appropriate sanction for non-disclosure. The Government argues that loss *per se* is enough to defeat the duty of disclosure. Under the constitutional requirement, it seems to stress the Supreme Court's use of the word "suppression" of evidence, and suggests that evidence cannot be "suppressed" which is not in Government possession at the time discovery is requested. The Government also relies upon the references in Rule 16 to evidence in the Government's "possession, custody or control" and in the Jencks Act to statements "in the possession of the United States."

 Technically, it may be that evidence which cannot be found is not in the Government's "possession." And, of course, that which the Government does not have it cannot disclose. But this line of reasoning is far too facile, and clearly self-defeating. The language of *Brady,* Rule 16 and the Jencks Act in-

15. United States v. Sopher, 7 Cir., 362 F.2d 523, 525 (1966). *See also* Davis v. United States, *supra* Note 12.

16. United States v. Crisona, *supra* Note 13, 416 F.2d at 113; United States v. Birnbaum, 2 Cir., 337 F.2d 490, 498 (1964).

17. Brady v. Maryland, *supra* Note 6, 373 U.S. at 87, 83 S.Ct. 1194.

cludes no reference to the timing of possession and suppression. It is most consistent with the purposes of those safeguards to hold that the duty of disclosure attaches in some form once the Government has first gathered and taken possession of the evidence in question. Otherwise, disclosure might be avoided by destroying vital evidence before prosecution begins or before defendants hear of its existence.[18] Hence we hold that before a request for discovery has been made, the duty of disclosure is operative as a duty of preservation. Only if evidence is carefully preserved during the early stages of investigation will disclosure be possible later.

In the cases before us, of course, the crucial evidence was not preserved. Thus the issue is whether full sanctions for non-disclosure ought to be invoked absolutely, or whether imposition of sanctions ought to depend upon the circumstances of the material's disappearance. Most instructive is the Supreme Court's recent decision in United States v. Augenblick, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969). In *Augenblick,* tapes had been made of the interrogation of a Government witness in a military court martial. Yet when the defendant requested discovery of the tapes, he was told that they could not be found. The Supreme Court stated that there was no credible indication that the evidence was "suppressed," presumably meaning bad faith suppression. Nonetheless, it held that "the Government bore the burden of producing [the tapes] or explaining why it could not do so." 393 U.S. at 355–356, 89 S.Ct. at 533. It found the Government's explanation

adequate, noting that, although the tapes' whereabouts were a complete "mystery," the Government had introduced extensive testimony on "the Navy's routine in handling and using such recordings" and had made "an earnest effort" to find them. 393 U.S. at 355, 89 S.Ct. at 533. Apparently there was no indication of negligence in the handling of the tapes. Under those circumstances, the Court held that there had been no violation of the due process clause even though the evidence was clearly discoverable under the Jencks Act. It allowed the conviction to stand.

■ *Augenblick* not only makes clear that the circumstances of the tape's disappearance in these cases should be relevant to the question of proper sanctions. It also suggests that, while sanctions should be imposed in cases of bad faith suppression of evidence, an exception will be made for good faith loss. Explicitly based on constitutional reasoning, *Augenblick* also must apply to sanctions under the Jencks Act, since the Court recognized that the tapes in question were covered by that statute.[19] We conclude, further, that *Augenblick* should inform the imposition of sanctions under Rule 16. An exception for good faith loss of important evidence must not be allowed to swallow the discovery rules, and the burden of explanation on the Government must be a heavy one; but criminal convictions otherwise based on sufficient evidence may be permitted to stand so long as the Government made "earnest efforts" to preserve crucial materials and to find them once a discovery request is made.

18. The Sixth Circuit has considered and rejected the same "possession" argument in the context of the Jencks Act. It commented: "To hold with the interpretation argued for * * * would be to to permit evasion and emasculation of the Jencks Act to the point of total ineffectiveness." United States v. Lonardo, 6 Cir., 350 F.2d 523, 530 (1965).

19. The Supreme Court had indicated twice before that at least under the Jencks Act the circumstances of destruction would be highly important. It had also made clear that good faith loss would not invoke the statutory sanctions, but it had—as in *Augenblick*—avoided the question of negligent destruction. Killian v. United States, 368 U.S. 231, 242, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961); Campbell v. United States, 365 U.S. 85, 98, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961).

 For the future, "earnest efforts" will be defined quite strictly. The Supreme Court's reference in *Augenblick* to the Navy's "routine in handling and using such recordings" and in an earlier opinion to an exception for loss "in good faith and in accord with * * * normal practice"[20] suggests the importance of regularity in the preservation of vital evidence. Of course, the regular procedures for preservation must be adequate to the task; systematic non-preservation of tapes involving Government undercover agents—as in the cases before us—might be regular, but would be insufficiently protective of defendants' right to discovery. Accordingly, we hold that sanctions for nondisclosure based on loss of evidence will be invoked in the future unless the Government can show that it has promulgated, enforced and attempted in good faith to follow rigorous and systematic procedures designed to preserve *all* discoverable[21] evidence gathered in the course of a criminal investigation. The burden, of course, is on the Government to make this showing. Negligent failure to comply with the required procedures will provide no excuse. Although we leave it up to the various investigative agencies to draft rules suited to their own method of operation, all such rules will be subject to review of their adequacy to the assigned task.

A more amorphous definition of "earnest efforts" would be difficult to administer and would inevitably deal less evenhandedly with individual defendants. A right so crucial as that of disclosure ought not to be built on such shifting sands. It ought, rather, to be protected by rules, systematically applied and systematically enforced.[22] By requiring that the discretionary authority of investigative agents be controlled by regular procedures for preserving evidence, we intend to ensure that rights recognized at one stage of the criminal process will not be undercut at other, less visible, stages.

 In the cases before us, of course, there were no adequate regular procedures and none had been required. Hence we must employ a more *ad hoc* approach here. Our difficulty is that these cases lie in a middle ground between bad faith and good faith loss. Agent Warden's failure to preserve the tape was intentional; he made no "earnest effort" either to turn it over to the United States Attorney's office once it was requested or to preserve it in the first place. At the least, he handled the evidence with regrettable negligence.

20. Killian v. United States, *supra* Note 19, 368 U.S. at 242, 82 S.Ct. at 308.

21. Although there is an exception for good faith loss of evidence, there is no exception for good faith administrative decision that certain evidence is not discoverable and thus need not be preserved. The Supreme Court made that much clear in Brady v. Maryland, *supra* Note 6, 373 U.S. at 87, 83 S.Ct. 1194, 10 L.Ed. 2d 215. Hence, in framing their rules for evidence preservation, investigative agencies must define discoverable evidence very broadly, including any materials that "might" be "favorable" to the accused. *See* Notes 5–7, *supra*. It should also be made clear that by "*all* discoverable evidence" this court includes materials discoverable under the Jencks Act as well as under *Brady* and Rule 16.

22. Our approach is in keeping with an incipient but powerful trend in the law— a new refusal to rely blindly upon the unstructured exercise of official discretion and a new judicial willingness to require promulgation of and obedience to rules by administrative agencies. *See, e. g.,* Environmental Defense Fund, Inc. v. Ruckelshaus, 142 U.S.App.D.C. ——, —— - ——, 439 F.2d 584, —— - —— (decided January 7, 1971); K. Davis, Discretionary Justice (1969). Professor Davis, favoring a resuscitation of the old non-delegation doctrine, specifically finds police investigative procedures in need of strict rule governance. K. Davis, *supra*, at 84–96. Professor Amsterdam, suggesting that courts should take this type of new approach to protection of suspects' rights in the 1970's, finds a constitutional basis for the requirement of rule making by the police. Amsterdam, The Supreme Court and the Rights of Suspects in Criminal Cases, 45 N.Y.U.L. Rev. 785, 814 (1970).

His reluctance to admit the tape's existence can only reinforce that conclusion.

A panel of the Second Circuit has considered a case involving negligent loss of evidence and has imposed the sanction of a new trial.[23] But there the evidence had later been found and the duty of disclosure could be satisfied at the new trial. Here, on the other hand, there is no indication that the tape will ever be found. A new trial would be simply a repetition of the first trial, similarly infected by non-disclosure of discoverable evidence. And a new trial without Agent Pope's testimony—a sanction under the Jencks Act—would be pointless, since without the testimony there would be no case. Thus the choice presented to us seems to be dismissal of the indictment or affirmance.

That is a choice which we are unwilling to make on the basis of the record before us. Agent Warden's testimony was far too vague and the suggestion of bad faith too shallowly explored. Further testimony from Agent Warden and from all other agents who may have had contact with the tape should clarify the degree of negligence, and possibly of bad faith, involved. Further inquiry into the regular procedures, if any, followed by the Bureau of Narcotics and Dangerous Drugs at the time would also be relevant; if it appears that in fact Agent Warden was simply following regular Bureau practice—inadequate though it was—the degree of his negligence might be somewhat reduced. A further inadequacy of the record before us is the lack of evidence concerning the conduct of the Assistant United States Attorney after he had been put on notice by defense counsel of the tape's possible existence. If he made any effort at that time to preserve the tape, there is no indication of it. Testimony in that regard should clarify the extent to which the prosecution sought to fulfill its duties under the disclosure requirement.

As indicated, in the future decision on the question of sanctions in cases such as these will be guided by the preservation requirement announced above, and negligence will be no excuse. On remand here the District Court should weigh the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial in order to come to a determination that will serve the ends of justice.

Remanded for proceedings consistent with this opinion.

McGOWAN, Circuit Judge (concurring):

I join in the court's disposition of this appeal, but I am perhaps not as sanguine as my colleagues that the proceedings on remand will illuminate what happened here more completely than does the present record. Agent Warden, in his testimony at the suppression hearing, seems to me to have given a forthright and by no means incredible account of the events in question, and I doubt that further pursuit of the matter will add much to what we now know of the fate of the tape. This is not to say that the premises on which he proceeded were soundly conceived as a matter of law, but his conduct strikes me as far from having a sinister cast. Thus it is that we will, in all probability, continue to confront on essentially the same terms the issue we now face, namely, whether the sanction of suppression is either necessary or appropriate under the circumstances revealed by this record.

Warden testified quite explicitly that he distinguished between tapes of conversations participated in by one of the Bureau's own agents, on the one hand, and third-party informers, on the other. In the latter case, it was his practice to preserve the tape with care for future use as corroborating evidence at trial. In the case of his own men, his single purpose was to assure their personal safety in the exposed and dangerous po-

**23.** United States v. Consolidated Laundries Corp., 2 Cir., 291 F.2d 563, 570–571 (1961).

sition they occupied.[1] Once the danger was past, the tape, in his view, had no further use, since he did not consider it necessary as corroboration of the agent's testimony at trial as to who said what. Tapes recorded in these circumstances were, so he testified, frequently erased and used again, and this might well have been what happened to the tape in question.[2]

When Agent Pope was placed in the hotel room by himself to meet with dangerous characters in the narcotics business, Warden, not surprisingly, thought it his responsibility to give him all possible protection. To this end, an adjoining room was taken, and a hole drilled in the wall. A listening device was placed in the hole, and agents in the next room listened by means of earphones. The device used was unitary in character, and, in addition to the individual earphones, its operation included recording on tape.[3] If the overheard conversations took a turn which indicated personal danger to Pope, the agents in the adjoining room could move speedily to his aid. The tape, as Warden conceived it, was purely incidental to this objective, and had no further utility once the interview had terminated without harm to Pope.

What Warden failed to recognize was that the tape became a piece of real evidence having "materiality to the preparation of [appellant's] defense" within the meaning of Rule 16(b), Fed.R.Crim. P. As such, it was clearly subject to discovery by the persons against whom Pope would testify at trial.[4] Any knowledgeable lawyer would have told him that it should have been preserved against the possibility that such discovery would be sought, as it was here. The court's opinion today rightly disavows for the future any notion that preservation serves no purpose or that it is not an obligation of law enforcement authorities. With notice so given, sanctions in the future will normally be operative.

1. The following testimony by Agent Warden is illustrative of his repeated assertions regarding the function of surveillance:

 "Question: Now, what was the purpose of your wanting to overhear conversations in the room [the undercover agent] occupied?

 Answer: It was strictly for the protection of [the undercover agent].
 * * *
 * * * * *
 Question: Now, when you originally set up this tape recorder, did you intend to use this for the purpose of gathering evidence against any particular person?

 Answer: The only reason for using the tape recorder was to make sure to know what was going on and for the agent's safety."

 He also testified that the persons with whom these large narcotics transactions were to be conducted were "known to carry weapons."

2. When asked what could have happened to the recording made here, Agent Warden responded,

 "in the last year, we have had other investigations going on and it is very common practice, if you are not saving the tape, to run the tape through again, on the machine, and it erases and records."

3. The description of the recording mechanism indicates that it was a single operative unit composed of a sensitive microphone and earphone both connected to the recorder. The inquiry on remand may disclose that, at least with this particular type of unit, the microphone and hearing apparatus could not be utilized to perform a surveillance function independently of the recording component. If that is the case, it would go far in explaining why a recording was made even though the sole purpose of surveillance was to protect the agent.

4. It may also fall within the ambit of Rule 16(a), although the latter sub-section does not, in my reading of it, fit this situation quite as comfortably as does 16(b). See United States v. Iovinelli, 276 F.Supp. 629, 631–632 (N.D.Ill.1967). In any event, the tape was clearly subject to discovery under the Rules of Criminal Procedure, and we need not, in my view, strain to find in the Constitution authority to compel its production or to impose the sanctions for failure to do so appropriate to the achievement of essential justice in this case.

We still have to decide what to do about this case.

Although I doubt that further inquiry will enlarge materially our knowledge of Warden's motivations or of what actually happened to the tape, it may be of some utility in ventilating how far the Bureau goes in providing prior legal planning and supervisory scrutiny of its investigative operations. If Warden did not have this kind of legal help, then this is only another instance of the deplorably familiar lack of forward legal planning in law enforcement. Corporations and private persons get into trouble when they forego this kind of assistance. So do public authorities.

The hearing on remand should also be informative as to why the prosecutor was not more alert to the legal significance of the existence or non-existence of the tape. Had he moved sooner, the tape might still have been found in Warden's desk, unerased. When the matter was first raised seven months before trial, the prosecutor's reaction was the stock one of automatically opposing discovery. Having succeeded in that misconceived gambit, he appears to have done nothing more. This, too, is not the kind of legal help that operational law enforcement personnel are entitled to have, even after the fact.