[No. G000721. Fourth Dist., Div. Three. Mar. 31, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH MICHAEL GONZALES, Defendant and Appellant.

COUNSEL

Edward J. Roberts, under appointment by the Court of Appeal, and Frank O. Bell, Jr., State Public Defender, and Ralph H. Goldsen, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, J. Richard Haden, Peter Quon, Jr., and Steven H. Zeigen, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

CROSBY, J.—We were directed by the Supreme Court to reconsider this case in light of *In re Michael L.* (1985) 39 Cal.3d 81 [216 Cal.Rptr. 140,

702 P.2d 222]. Following a different decision, however, *California* v. *Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528], we must conclude police failure to preserve an attempted robbery victim's written description of the perpetrator's tattoo does not require, as we formerly held, reversal of Joseph Gonzales' conviction per *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361] and retrial with an appropriate corrective instruction (*People* v. *Zamora* (1980) 28 Cal.3d 88 [167 Cal.Rptr. 573, 615 P.2d 1361]).

I

On the afternoon of January 29, 1982, Jose Barrera, a discount gas station cashier in a bullet-proof glass booth, was approached by a Latin male bandit. The robber simulated possession of a pistol in a paper bag, demanded the cash receipts, and threatened to shoot. Barrera, confident of the protective glass, instead copied a description on a sales voucher of the distinctive one-word tattoo, "g-u-i-l-t-y," he said he observed on the man's right biceps. The frustrated felon fled.

Barrera called police; and three officers were dispatched, accompanied by a probation officer "ride-along." Barrera recounted the incident, described the robber, and handed over his written rendition of the tattoo. One or two of the officers, as well as the probation officer, examined the document. But it was left behind when they departed and was apparently discarded by the victim's shift replacement. The victim's description of the tattoo was included in a subsequently prepared police report, however, with the word "guilty" correctly spelled.

Although he tentatively selected another individual in an eighteen-picture photo lineup soon after the crime, Barrera identified Gonzales from a set containing six different mug shots more than five months later. Gonzales became a suspect when a sheriff's deputy reported a tattoo he noticed on his arm. It is located on Gonzales' *left forearm,* however, not his right biceps.

The parties describe the tattoo differently on appeal. The Attorney General claims it reads "not guilty," while the defense alleges it says, "mot gulity" (*sic,* as to both words). We have examined the photographs received in evidence and are satisfied the defense is correct: The tattoo reads, "mot gulity."

The distinction is obviously critical, particularly as to the second word: Barrera did not read or speak English and testified he had never seen the English word "guilty" before. While the word "mot" might have been

covered by clothing or simply missed by the victim, the spelling discrepancy in the second word is far more difficult to explain. The odds Barrera would transpose letters to *correct* the spelling of a word in a strange language appear remote indeed.

In an interview months after the crime occurred, Barrera recalled only the first three letters of the second word. He thought they were "g-u-y." When shown a piece of paper with the word "guilty" written out at the hearing on the *Hitch* motion in the superior court, he said it looked correct, although he could actually recall only the first letter by that time.

Taking the view that the officers were not required to gather evidence under *Hitch,* only to preserve that which had already been collected, the trial court denied Gonzales' *Hitch* motion. It held the victim's note was never "gathered" within the meaning of *Hitch,* although he prepared it for the police and at least one policeman and the probation officer physically handled the slip of paper and another police officer may have, depending on whose recollection was accurate.

At trial Gonzales, supported by his former wife, presented an alibi defense. He testified he had never visited the gas station where Barrera was employed and was home all afternoon on the day of the crime. His tattoo, he said, was applied when he was 12 years of age by an amateur artist. (See Pen. Code, § 653.)

In closing argument the prosecutor suggested the spelling discrepancy was explained by the cursory examination of the paper describing the tattoo, falling darkness, and the time lapse between the interview and the preparation of the police report—in other words the officers innocently failed to note the error and corrected the spelling inadvertently. Our initial resolution of this appeal was to reverse with directions to deprive the prosecutor of that explanation on retrial by means of an appropriate instruction.

Contrary to the trial court, we held the evidence had been "gathered" because at least one officer physically received and examined it at the scene. We also decided the failure to preserve the original writing, although grossly negligent, could not have been malicious. Consequently, while we agreed the sanction of dismissal was unwarranted, we held Gonzales *was* entitled to a jury instruction conclusively establishing that the victim's written description of the tattoo read, "g-u-i-l-t-y." (See *People* v. *Zamora, supra,* 28 Cal.3d 88, 99-103.)

The month after our decision was filed the United States Supreme Court issued its opinion in *California* v. *Trombetta, supra,* 467 U.S. 479, which

took a very narrow view of the police duty to preserve evidence under compulsion of federal due process. The Attorney General, downplaying the gathering issue and now relying on *Trombetta,* petitioned the Supreme Court of California for hearing. He claimed the victim's lost note was not material per *Trombetta* because, under the test announced there, the officers could not have appreciated its exculpatory value at the time and proof of the tattoo's description was available by another reasonable means as it was included in the officers' crime report. The Supreme Court of California granted hearing, but has now returned the matter to us for reconsideration "in light of *In re Michael L.* [*supra*] 39 Cal.3d 81."

## II

In our first bout with this case, the arguments focused purely on the gathering issue. The reason was this: *Hitch* described a police duty to *preserve* evidence whenever there is a "reasonable possibility" it might be "favorable . . . on the issue of guilt or innocence." (*People* v. *Hitch, supra,* 12 Cal.3d at p. 649.) Barrera's recordation of the robber's tattoo easily met the *Hitch* reasonable possibility test. But our Supreme Court had never imposed a duty to *gather* such evidence, although there were rather explicit hints that it might do so in a proper case. (See, e.g., *People* v. *Hogan* (1982) 31 Cal.3d 815, 851 [183 Cal.Rptr. 817, 647 P.2d 93].) Many thought *In re Michael L., supra,* 39 Cal.3d 81 was to be it.

Superficially, *In re Michael L. is* factually similar to our case. Officers investigating a donut store robbery viewed a videotape of the crime, but did not seize it as evidence. Later, the tape was inadvertently erased by the store owner. The defense brought a *Hitch* motion seeking suppression of all fruits of the tape, including any in-court identification.

The Supreme Court found no *Hitch* error for several reasons. First, the officers did attempt to collect the videotape, but were refused by the victims who promised to preserve it for trial. Also, the officers did the next best thing; they took a number of photographs of freeze-frame stills on the tape. (*Id.,* at p. 87.) Finally, according to the court, the sanction proposed was well out of proportion to the sins, if any, of the officers. (*Ibid.;* see *People* v. *Zamora, supra,* 28 Cal.3d 88, 99-103.)

■ Thus, while the majority did not reach the gathering issue in *Michael L.,* it obviously found the videotape was never legally in the possession of the police at any time before it was lost. Is the same true of Barrera's note? We believe not.

In *Michael L.* the lawful possessors of the videotape refused police requests to transfer possession to them; and there is no indication the officers

ever physically held or even touched it, although they were permitted to view it several times and to photograph it. In this case the victim prepared the evidence for police consumption, and he literally gave it to the investigating officers. A valid gift, combining the required elements of donative intent and transfer and acceptance of possession, however briefly, arguably did occur here.

It seems a bit of a stretch, perhaps, to think of a criminal evidentiary problem in terms of common law property concepts; but third party property rights frequently create difficult legal conundrums in criminal matters. (See, e.g., *Steagald* v. *United States* (1981) 451 U.S. 204 [68 L.Ed.2d 38, 101 S.Ct. 1642], *Zurcher* v. *The Stanford Daily* (1978) 436 U.S. 547 [56 L.Ed.2d 525, 98 S.Ct. 1970], and *People* v. *Codinha* (1982) 138 Cal.App.3d 167 [187 Cal.Rptr. 682].) The court in *Michael L.* appears to have been understandably perplexed by the implications of imposing a duty on officers to seize evidence of a crime in the lawful possession of innocent persons without legal process or consent.

Our case, as we have explained above, presents no such problem, however. The evidence was willingly created for the police and given to them. At least one officer had actual possession of the description of the tattoo with the consent of the person who created it, the victim. Consequently, we still fail to discern any gathering issue here; the writing *was* gathered under any reasonable definition of the word.

Ironically, we find strong support for this position in an odd place, *Trombetta* itself. *Trombetta* dealt with the question of whether federal due process requires police departments to obtain available devices for drunk driving breath testing machines in order to preserve breath samples of test subjects. A tautological subissue was whether a duty to preserve the evidence may be denied simply on the basis that the machines do not actually "gather" the breath samples they test. On the latter point, the court said no: "We accept the California Court of Appeal's conclusion that the Intolilyzer procedure brought respondent's breath samples into the possession of California officials. The *capacity to preserve* breath samples is equivalent to the actual possession of samples." (*California* v. *Trombetta, supra,* 467 U.S. at p. 487, fn. 7 [81 L.Ed.2d at p. 421], italics added.) We agree. The officers had both possession of, and the capacity to preserve, Barrera's note. The trial court's holding, on the other hand, distills to the absurd proposition that "gathered evidence" may be defined as evidence which is not lost.

### III

Thus, we must resolve the issue it was not necessary to consider in *Michael L.* There our Supreme Court stated, "It is apparent that the *Trombetta*

formulation of the duty-to-preserve test differs substantially from our own *Hitch* standard. It is unnecessary, however, for us to reach the question whether *Hitch* has 'survived' *Trombetta,* for we have concluded that, under the circumstances in this case, exclusion . . . is unwarranted even under our pre-*Trombetta* authority." (*In re Michael L., supra,* 39 Cal.3d at p. 86.) We have no alternative ground upon which to base our decision: Having previously held *Hitch* controlled the outcome of this case and, as we have discussed, finding nothing in the *Michael L.* opinion to change our conclusion, we must decide whether the *Trombetta* standard has replaced *Hitch* and, if so, whether the outcome here is affected.

Both questions must be answered in the affirmative. The answer to the first is obvious. Although we frankly prefer the more practical *Hitch* formulation, *Hitch* and its progeny have always been grounded solely on the federal due process guaranty. And in *Trombetta* the United States Supreme Court arrived at a different result on virtually identical facts. Under the circumstances we must, of course, follow the *Trombetta* rule. ■ As the Court of Appeal noted in its decision on remand from the United States Supreme Court in *Trombetta* itself, "unless and until our Supreme Court holds otherwise, the appropriate test to apply in determining the materiality of nonpreserved [evidence] is the federal due process test set forth in *California* v. *Trombetta.* (See *People* v. *Aguilar* (1985) 165 Cal.App.3d 221, 224-225 [211 Cal.Rptr. 333].)" (*People* v. *Trombetta* (1985) 173 Cal.App.3d 1093, 1100 [219 Cal.Rptr. 637]; see also *Scott* v. *Meese* (1985) 174 Cal.App.3d 249, 256-257 [219 Cal.Rptr. 857].)

There are just two key features to the standard devised in *California* v. *Trombetta:* (1) whether the evidence is material in the subjective sense, i.e., that it is exculpatory and was known to be so at the time it was lost, and (2) whether it can be replaced by other evidence, less satisfactory or not. (See also *Killian* v. *United States* (1961) 368 U.S. 231 [7 L.Ed.2d 256, 82 S.Ct. 302].) Our case meets neither test.

Materiality may be defined neutrally, i.e., that a piece of evidence has something to do with the case, or subjectively, i.e., that it will necessarily be beneficial to the defense. *Hitch* straightforwardly adopted the opinion of *United States* v. *Bryant* (D.C. Cir. 1971) 439 F.2d 642, summarizing its rule as follows: "Accordingly, we hold that *sanctions for nondisclosure based on loss of evidence will be invoked in the future unless the Government can show that it has promulgated, enforced and attempted in good faith to follow rigorous and systematic procedures designed to preserve all discoverable evidence* gathered in the course of a criminal investigation." (*People* v. *Hitch, supra,* 12 Cal.3d at p. 652.) While *Hitch* was grounded on federal due process, as we explain below, it clearly embraced a broad

definition of "discoverable evidence," i.e., that which has some relation to the determination of guilt *or* innocence.

The subjective *Trombetta* formulation is quite different. It evolved as follows: The definition of "discoverable evidence" under federal due process was provided by *Brady* v. *Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194], where the Supreme Court said, "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Id.*, at p. 87 [10 L.Ed.2d at p. 218].) In other words, combining *Brady* and *Bryant,* the federal rule is that the prosecution must preserve and provide only evidence favorable to the defense.

*Trombetta* puts it this way: "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and also be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*California* v. *Trombetta, supra,* 467 U.S. at p. 489 [81 L.Ed.2d at p. 422], fn. omitted.) In the footnote appended to this passage, the Supreme Court confirmed the *Brady-Bryant* formula: "In our prosecutorial disclosure cases, we have imposed a similar requirement of materiality, [citation], and have rejected the notion that a 'prosecutor has a constitutional duty routinely to deliver his entire file to defense counsel.' [Citations.]" (*Id.,* at p. 489, fn. 8 [81 L.Ed.2d at p. 422].)

The court went on to explain, "Although the preservation of breath samples might conceivably have contributed to respondents' defenses, a dispassionate review of the Intoxilyzer and the California testing procedures can only lead one to conclude that the chances are extremely low that preserved samples would have been exculpatory." (*Id.,* at p. 489 [81 L.Ed.2d at p. 422].) In *Hitch,* of course, using an objective standard of materiality, our Supreme Court reached the opposite result on virtually identical facts: "We must therefore decide by what principles a court should determine a defendant's claim for relief where, as here, the evidence subject to disclosure is no longer in existence and the court is therefore unable to ascertain whether such evidence was, or would have been, favorable to the defendant and material on the issue of his guilt or innocence." (*People* v. *Hitch, supra,* 12 Cal.3d at p. 648.)

The California Supreme Court then proceeded to adopt the rule applicable in cases where the prosecution has refused "to disclose the identity of an

informer where under similar circumstances it cannot be established that the informer's testimony, which is of course unknown, is favorable and material." (*Ibid.*) The court stated, "In all of these cases we recognized the impossible task which the defendant faced in seeking to show that the informer would be a favorable and material witness. As we explained in *Price* [v. *Superior Court* (1970) 1 Cal.3d 836, 843 [83 Cal.Rptr. 369, 463 P.2d 721]], 'The defendant need not prove that the informer would give testimony favorable to the defense in order to compel disclosure of his identity, nor need he prove that the informer was a participant in or even an eyewitness to the crime. The defendant's "burden extends only to a showing that 'in view of the evidence, the informer would be a material witness on the issue of guilt and non-disclosure of his identity would deprive the defendant of a fair trial.' [Citation.]" (*Ibid.*)

*Hitch* concluded, "Turning to the case at bench, we first observe that the *results* of the breathalyzer test by their very nature constitute material evidence on the issue of guilt or innocence upon a charge of drunk driving. We need only point to [then] section 23126 of the Vehicle Code, which provides inter alia that if the amount of alcohol in a person's blood . . . was 0.10 percent or more by weight, 'it shall be presumed that the person was under the influence of intoxicating liquor at the time of the alleged offense.'" (*Id.,* at p. 647, fn. omitted.)

California proceeded to apply its rule in cases where, as here and in *Hitch* itself, the value of the lost evidence was impossible to determine. (See, e.g., *People* v. *Moore* (1983) 34 Cal.3d 215 [193 Cal.Rptr. 404, 666 P.2d 419] [urine sample] and *People* v. *Nation* (1980) 26 Cal.3d 169 [161 Cal.Rptr. 299, 604 P.2d 1051] [semen sample].) Thus, the contrast between the California and federal interpretation of the federal due process clause as it applies to missing evidence is clear. In order to meet the federal definition of materiality, the constable must have *subjectively* anticipated the exculpatory nature of the evidence in order to expose the prosecution to sanction for its loss.

This case illustrates several grave difficulties with that rule. First, no one could have appreciated the dramatic significance of the spelling of the word written on this piece of paper until Gonzales was accused and the errant sequence of the letters of his tattoo was noted. Second, how can an officer ever make a determination of materiality in the federal sense before a suspect is caught or at least identified? Was the victim's note, viewed from the time it was discarded, "material" evidence under the federal rule as to every person in the world who does not bear a tattoo of that description and only nonmaterial as to those who do? Thus, does materiality depend upon who is finally accused? Also, who must have the knowledge? In many lost

evidence cases a property officer, who has no familiarity with the facts or the relevance of a particular item, is the culprit. Does that ignorance shield the prosecution from responsibility? And, of course, the hardest question of all is, how can the materiality of that which no longer exists be determined? The *Hitch* formulation avoided these problems.

■ Nonetheless, we must reluctantly hold that the victim's written description of the tyro robber's tattoo simply fails to qualify under the *Trombetta* subjective materiality test. The officers who failed to preserve it could not have known it would turn out to be vital evidence for the defense of this particular accused, although it would exculpate almost everyone else on this continent. (*People* v. *Tierce* (1985) 165 Cal.App.3d 256, 265, fn. 3 [211 Cal.Rptr. 325].)

Moreover, there is a second prong to the *Trombetta* standard: The evidence must "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*California* v. *Trombetta, supra,* 467 U.S. at p. 489 [81 L.Ed.2d at p. 422].) This case also fails that test, at least as *Trombetta* describes it. Gonzales produced "comparable" evidence at trial, the testimony of the officers that the word "guilty" in the description of the tattoo was correctly spelled and the testimony of the victim that he did not speak English. In our former decision we found this insufficient because it left the prosecutor an explanation for the spelling discrepancy based on the officers' own neglect.

Again, *Trombetta* compels a different view. There, in place of potential absolute proof that a particular breath test was inaccurate, the court was more than willing to settle for far less satisfactory secondary evidence: "Even if one were to assume that the Intoxilyzer results in this case were inaccurate and that breath samples might therefore have been exculpatory, it does not follow that respondents were without alternative means of demonstrating their innocence. Respondents and amici have identified [just a few of the] ways in which an Intoxilyzer might malfunction: faulty calibration, extraneous interference with machine measurements, and operator error." (*California* v. *Trombetta, supra,* 467 U.S. at p. 490 [81 L.Ed.2d at p. 423].) It is not our place to comment further. Gonzales had far more persuasive secondary evidence available than the compilation of speculation found to have been sufficient in *Trombetta,* and we must accordingly defer.

We have considered the dissent of the Chief Justice in *Michael L.* in which she suggests, "it is necessary to emphasize that the duty-to-preserve principles announced in *Hitch* rest on independent state grounds." (*In re Michael L., supra,* 39 Cal.3d at p. 101 (dis. opn. of Bird, C. J.).) Proposition 8 and *In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d

744] dealt adherents of the independent state grounds theory a sharp set-back, however. If the *Hitch* rule does survive *Trombetta,* it appears to have lost a major sanction, the power to exclude evidence.

Nonetheless, in our original opinion we did not propose to suppress evidence, only a prosecutor's argument; and this crime preceded Proposition 8 in any event. (See *People* v. *Angeles* (1985) 172 Cal.App.3d 1203, 1212 [218 Cal.Rptr. 756] and *People* v. *Tierce, supra,* 165 Cal.App.3d 256.) But *Michael L.* was also a pre-Proposition 8 case, and no other member of the court joined the Chief Justice's dissent. Nor have we discovered other precedent which might support it; *Hitch* was always a formulation based on the federal guaranty of due process according to our research. *Trombetta* might yet inspire a reconsideration of that position in the future, but Proposition 8 and *Lance W.* will probably chill any enthusiasm for the exercise. As to past cases such as this, we have no basis to view the issue in other than federal terms.

Judgment affirmed.

Trotter, P. J., and Sonenshine, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 17, 1986.