Steve P. **XYDAS**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 21893.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 7, 1970.

Decided April 21, 1971.

Certiorari Denied Oct. 12, 1971. See 92 S.Ct. 57.

Bazelon, Chief Judge, concurred and filed opinion.

Mr. Ira M. Lowe, Washington, D. C., with whom Messrs. Michael M. Kearney and Stephen S. Millstein, Washington, D. C., were on the brief, for appellant.

Mr. Harold J. Sullivan, Asst. U. S. Atty., with whom Messrs. Thomas A.

Flannery, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Before BAZELON, Chief Judge, VAN DUSEN,* Circuit Judge, U. S. Court of Appeals for the Third Circuit, and WILKEY, Circuit Judge.

WILKEY, Circuit Judge:

Appellant Xydas was convicted on one count [1] of violating 18 U.S.C. § 2314, interstate transportation of stolen goods.[2] On this appeal he raises several points, only two of which require discussion.

## I. FACTUAL BACKGROUND

The charge on which appellant was convicted arose out of a burglary committed on the night of 22 August 1964 in Washington, D. C. On that evening, three individuals, Barnes, Baker, and Hamilton, all acquaintances of appellant Xydas, broke into the French Poodle Dress Shop at 1211 Connecticut Avenue, N.W., and stole some 96 furs and fur-trimmed articles of women's clothing. The furs were placed in a rented truck and initially transported to the house of one James Skeens in Landover, Maryland. From there, at about 3:30 a. m. on the morning of 23 August 1964, the furs were taken to appellant Xydas' house in Prince George's County, Maryland, and shortly thereafter, still in the truck, were transported to a garage in Riverdale, Maryland, owned by Xydas' sister. The furs were then unloaded from the truck and stored in the garage to await their anticipated sale to buyers from New York.[3]

---

* Sitting by designation pursuant to 28 U.S.C. § 291(a) (1964).

1. Appellant and several others were originally named in a multicount indictment charging conspiracy and a number of substantive offenses. Upon motion, appellant was tried separately on three substantive counts charging burglary, grand larceny and interstate transport of stolen goods. He was acquitted on the first two charges and convicted on the third. Pursuant to a stipulation, the conspiracy charge was dismissed following trial of this case.

2. 18 U.S.C. § 2314 provides in pertinent part:

  "Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, * * * shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

3. The furs were removed from the garage and apparently sold before the arrest of appellant or any of the others involved.

Barnes[4] testified that on the morning of 22 August, before the burglary took place, he telephoned Xydas and "told him that I was going to make the French Poodle and that I had to have a place to store the furs until I could get a buyer down from New York," and that Xydas told him to "bring them out to his [Xydas'] house and put them in his basement." Barnes further testified, however, that when he and Skeens arrived at Xydas' house with the truck, Xydas refused to store the furs in his basement because there were more furs than Xydas had anticipated and his wife would object. According to Barnes, Xydas then suggested that the furs be stored in his sister's garage. For providing this assistance, Barnes related, Xydas was given two of the furs.

Appellant admitted his acquaintance with Barnes and Skeens and agreed that the furs had indeed been brought to his house and then transferred at his suggestion to his sister's garage. He denied, however, any knowledge of the theft of the furs prior to its occurrence, and testified that his first involvement in the situation came when he received a telephone call from Skeens at about 3:15 a. m. on the morning of Sunday, 23 August, informing him that Skeens and Barnes wanted to come over to see him. He claimed that he first became aware of the furs and the fact that they were stolen when shortly thereafter Skeens and Barnes arrived at his home with the truck. He testified that he arranged for the storage of the furs in his sister's garage in order to turn Barnes and Skeens over to the FBI, and that he kept the two furs given him by Barnes in order to provide the FBI with evidence. Some three weeks later, and long after the furs had been removed from the ga-

rage and presumably sold by Barnes,[5] Xydas did in fact go to the FBI and related his version of his involvement with the furs, identifying Barnes and Skeens as the perpetrators of the French Poodle burglary. Xydas subsequently turned the furs he had been given over to the FBI.

## II. THE DEFENSE SUBPOENA OF XYDAS' FBI INFORMANT'S FILE

Appellant argues that he was unfairly hindered in the presentation of his defense by the Government's refusal to produce, pursuant to subpoena, the entire contents of the FBI file relating to Xydas.

The theory of the prosecution was that Xydas had aided and abetted the interstate transportation of the stolen furs by agreeing prior to the theft to provide a place to store them.

The defense theory, on the other hand, was that Xydas did not become involved in the transaction until after the transportation from the District of Columbia to Maryland had been accomplished, and therefore he could not be an aider and abettor of a violation of 18 U.S.C. § 2314. Xydas' storing of the furs was presented as not being the result of any prior-to-the-theft arrangement, but rather as an attempt on his part to aid the FBI in capturing Barnes and Skeens. To buttress this view, the defense sought to show that Xydas had been acting as an unpaid confidential informant of the FBI for a number of years prior to the instant offense. In order to establish Xydas' past relationship with the FBI, prior to trial the defense attempted to subpoena the entire FBI file containing all memoranda of agents who had contacted Xydas periodically since 1959.

The bulk of the furs were never recovered. Appellant's indictment did not charge him with any complicity of the interstate transportation of the furs from Maryland to New York.

4. Barnes, a professional burglar, was the key witness in a number of cases involving the operations of a burglary ring in the District of Columbia. *See* Wallace v.

United States, 134 U.S.App.D.C. 50, 412 F.2d 1097 (1969); Hamilton v. United States, 139 U.S.App.D.C. 368, 433 F.2d 526 (1970). Appellant was tried after the *Wallace* trial, but before the *Hamilton* trial.

5. Barnes testified that the furs remained in the garage approximately four days.

The Government provided the defense with all FBI reports in its possession containing statements made by Xydas to FBI agents concerning the offenses charged in the indictment, but emphatically resisted production of the remainder of the file. The Government contended that the documents sought, reports of FBI agents concerning their contacts with Xydas, were confidential intradepartmental memoranda, the disclosure of which would be detrimental to the FBI's law enforcement function by revealing information concerning the manner and procedures by which the FBI gathers and distributes criminal intelligence data.

In response to this claim of privilege,[6] the trial judge reviewed the FBI documents *in camera* and ruled thereon as follows:

[T]here is nothing vitally important to you [the defense] contained in those records, but first the Court finds that there has been no showing of a particularized need for the disclosure of these confidential records of the Federal Bureau of Investigation. There is nothing of an exculpatory nature contained therein, and there is nothing that is material or relevant to the indictment in the pending case. As I previously pointed out, many of these

contacts referred to a period of time long before the present offenses were even committed, and had no connection whatsoever with that offense.

Accordingly, the court granted the Government's motion to quash the subpoenas. Prior to the trial court's quashing of the subpoenas, the Government, in response to the reasons stated by the defense as to why the production of the FBI file was necessary, offered a stipulation as to certain facts reflected in the file. As modified under the guidance of the trial judge after his *in camera* inspection of the file, the stipulation was accepted by the defense and provided the following information:

(1) the fact of appellant's displayed willingness expressed in June of 1959 to provide information on a confidential basis;

(2) the names of the FBI agents with whom appellant had principally been in contact;

(3) the date of each such contact as reflected in the FBI files;

(4) the pertinent instances in which appellant took the initiative in making the contacts; and

(5) a general description of the subject matter of the information provided by appellant.[7]

---

6. "The Government may be required to produce documents in its possession unless it makes a valid claim of privilege." Mackey v. United States, 122 U.S.App. D.C. 97, 98, 351 F.2d 794, 795 (1965).

7. The entire stipulation as agreed to and entered into evidence was as follows (the names appearing above the text of the stipulation were written in by counsel on the margin of the actual stipulation in the places indicated herein by asterisks to represent the agent or agents with whom appellant was principally in contact during the respective periods indicated):

Bob Franklin

It is agreed and stipulated between counsel for the United States that on June 25, 1959, the defendant Xydas was first contacted by a Special Agent of the FBI concerning the possibility of his furnishing information to the FBI on a confidential basis. Inasmuch as he dis-

played a willingness to supply such information, he was thereafter * contacted either at his request or at the request of various Special Agents on the following dates: 7/20/59; 7/23/59; 8/8/59; 9/22/59; 10/23/59. On 11/13/59 contact with defendant Xydas was terminated.

Carl Giovanetti

Contacts with defendant Xydas were reinstituted by the FBI on 9/23/60 and he was thereafter contacted on the following dates: 9/28/60; 11/2/60; 12/12/60; 1/9/61; 1/13/61; 2/4/61; 2/21/61; 3/10/61; 4/7/61; 4/12/61; 5/9/61; 6/5/61; 6/22/61; 7/11/61; 7/17/61; 8/18/61; 9/26/61; 10/2/61; 10/6/61; 11/17/61;* 12/14/61; 1/18/62; 2/4/62; 3/21/62; 4/19/62; 5/14/62; 6/26/62; 8/9/62; 9/6/62; 9/24/62; 10/22/62; 11/16/62; 12/31/62; 1/21/63; 2/28/63; 4/2/63;

Rule 16(a), F.R.Crim.P., authorizes the trial court to permit inspection by the defendant of any "written or recorded statements" of the defendant which are in the Government's possession.[8] On this appeal the Government argues that the FBI reports here in question cannot be considered "statements" of the defendant "since they are reports made by agents in a manner prescribed by the Bureau and are not limited to transcriptions of statements made by appellant to the agents." Rather, the Government insists, any discovery must be sought under the terms of subsection (b) of Rule 16 which permits discovery of "other documents" in the control of the Government only upon a showing of materiality and reasonableness. We need not decide which subsection of Rule 16 is applicable here, however, since neither subsection (a) nor (b) grants appellant any discovery as of right in all cases; discovery under either section is subject to the sound discretion of the trial court. Rule 16(e) provides, *inter alia*, that:

> Upon a sufficient showing the court may at any time order that the discovery or inspection be denied, restricted or deferred, or make such other order as is appropriate.[9]

5/3/63; 5/6/63; 5/7/63; 6/12/63; 6/18/63; 6/19/63; 6/27/63; 7/8/63; 8/5/63; 8/23/63; 9/4/63; 9/23/63; 11/4/63; 11/5/63; 11/7/63; 11/21/63; 11/23/63; 11/24/63; 12/5/63; 1/10/64; 2/18/64; 3/10/64; 4/9/64; 4/10/64; 5/14/64. On the latter date contacts with defendant Xydas were again terminated.
Richard Marquise
Edward Wills

On 9/15/64, the defendant Xydas contacted Special * Agents of the FBI and furnished information concerning the burglary of the French Poodle Dress Shop. Xydas took the initiative in this contact, having come to the Washington Field Office of the FBI. He was also interviewed about this matter 9/16/64; 9/22/64; 9/23/64; 10/2/64; 11/3/64, during which interviews he was not then being "operated" as an informant.
Gib McNeely

On 12/2/64 defendant Xydas was recontacted to renew attempts to develop him as an informant concerning these and other matters. He was thereafter contacted on the following dates: 12/3/64; 12/8/64; 12/9/64; 1/9/65;* 2/8/65; 3/8/65; 3/15/65; 4/6/65; 4/29/65; 6/8/65; 6/22/65; 7/20/65; 8/19/65; 9/15/65; 10/5/65; 11/5/65.
Since regular contact was ceased by the FBI on 11/18/65, no further effort was made to develop Xydas as an informant. However, on 1/7/66, the defendant Xydas contacted an agent of the FBI concerning an investigation currently being conducted by the Internal Investigative Unit of the Washington, D. C. Metropolitan Police Department. A similar contact was again made 5/2/66, upon Xydas' initiative.
Some of the above referred to contacts beginning in 1969 resulted in obtaining no information concerning the matters inquired into and some resulted in obtaining merely non-specific, general information. The information supplied to the FBI by the defendant Xydas, as a result of the contacts since 1959, has largely concerned gambling matters and has been of generally intelligence-type information concerning his associates.

8. While the documents here involved were sought via subpoena under Rule 17, Fed. R.Crim.P., this, where the subpoena seeks documents in the possession of the Government, is simply an alternative means of obtaining information available under Rule 16 motions to produce for inspection and copying. Although Rule 17 was not intended as a discovery device, prior to 1966 its use involved discovery consequences because it permitted the pre-trial production of certain "evidentiary" material which could not have been obtained under Rule 16. The 1966 amendment, however, broadened Rule 16 to the point where there is no longer any information obtainable via subpoena which is not covered by Rule 16. *See* 1 Wright, Federal Practice and Procedure § 274 (1969). For the purposes of this case, we see no relevant differences between Rules 16 and 17 in the criteria governing disclosure of the documents here sought. We therefore deal with appellant's contention that the subpoena was improperly quashed by evaluating it in light of the trial judge's power to control discovery under Rule 16.

9. It is true that discovery under Rule 16 (a) is, as a rule, almost automatically available to the defendant since no showing of any kind is required of him as a prerequisite to production of the documents sought. However, where, as here,

We are satisfied that in view of the considerations advanced by the Government in support of its claim of privilege, the trial court here followed the proper course in inspecting the documents sought *in camera,* and did not abuse its discretion in quashing the subpoena following such inspection.[10] We have carefully examined these documents ourselves, in light of the indictment and record in this case, and we are in agreement with the trial judge's evaluation that "there is nothing of an exculpatory nature contained therein, and there is nothing that is material or relevant to the indictment in the * * * [instant] case." Furthermore, it appears that every reason asserted by appellant at the pre-trial hearing for desiring to inspect these documents was fully met by the stipulation, in which the Government admitted that Xydas had served as a confidential informant to the FBI.[11]

A reading of the transcript compels the conclusion that the principal issue tendered to the jury was not whether Xydas had cooperated with the FBI on other occasions, but rather why, if Xydas' intent in assisting in the storage of the stolen furs was to help in the apprehension of Barnes and Skeens, did he not get in touch with his FBI contacts until over three weeks had passed and the furs were long gone from his sister's garage.[12] Xydas' testimony in explanation of this delay appears to us patently incredible and we have little doubt that the jury so evaluated it.

## III. THE PROSECUTION'S NON-DISCLOSURE OF "EXCULPATORY" INFORMATION

Even if Xydas' claim that he assisted in storing the furs only to aid the FBI is rejected, however, Xydas' conviction for aiding and abetting the interstate transport of the stolen furs must rest upon proof of some assistance rendered by him before or during the occurrence of the interstate transportation. The Government's case in this respect rested upon the testimony of Barnes that Xydas had agreed on the morning of the French Poodle burglary to supply an interim storage place for the furs. As recounted *supra,* Xydas denied any prior knowledge of the burglary or the making of any prior arrangement with Barnes. Thus,

---

the Government opposes production and advances reasons why the documents should not be disclosed, the court has discretion to deny or limit discovery as detailed in Rule 16(e). *See* United States v. Bryant, 142 U.S.App.D.C. 132, 439 F. 2d 642 (1971) ; United States v. Projansky, 44 F.R.D. 550, 554 (S.D.N.Y. 1968) ; United States v. Federman, 41 F.R.D. 339, 341 (S.D.N.Y.1967) ; 1 Wright, Federal Practice & Procedure, § 353, n. 33 (1969).

10. *See* Taglianetti v. United States, 398 F.2d 558 (1st Cir. 1968) ; United States v. Curry, 278 F.Supp. 508 (N.D.Ill.1967).

11. Appellant's counsel argued that the records should be made available to him in order to (1) show that Xydas had in fact cooperated with the FBI; (2) learn the dates of Xydas' contacts with the FBI in order to show their continuity; (3) learn which agents had contacted Xydas during various periods in order to know which agents to call as defense witnesses; (4) learn to what extent Xydas had initiated the contacts. In view of the Government's claim of privilege we think that these purposes were all adequately fulfilled by the stipulation.

At another point, however, counsel stated :

These are subpoenas issued for these documents. I think I have a right to look at them and see if there is anything in the documents that could be helpful to the defense. That is the reason I subpoenaed them.

This, of course, is nothing more than a statement of a desire to go on a "fishing expedition" in confidential government records in the hope that something "helpful to the defense" might turn up. In such circumstances, privilege may properly be invoked by the Government to prevent such disclosure.

12. As noted *supra,* Barnes testified that the furs were removed from the garage after four days. On cross-examination Xydas admitted that when he finally went to the FBI some three weeks later, he stated that he wanted to get his involvement in the French Poodle offense "off his conscience."

if Xydas' testimony were to be believed that he first knew of and agreed to store the furs when Barnes and Skeens arrived at his house at 3:30 a. m., he would merely be guilty of receiving stolen goods or of being an accessory after the fact of the interstate transportation, offenses with which he was not charged in the instant indictment. Clearly, the jury was presented with the decision of whom to believe on this issue, Barnes or Xydas; and, equally clearly, on the testimony presented, the jury chose to believe Barnes and to disbelieve Xydas.

Nevertheless, it must be noted that the truckload of furs was first taken from the District of Columbia to the house of James Skeens in Maryland. Subsequently the furs were taken to Xydas' house, and then to his sister's garage. Prior to the commencement of the trial Xydas' counsel requested access to the grand jury minutes of a number of individuals involved in or related to the offenses charged in the indictment. Among these was Marsha Skeens, the wife of James Skeens. In addition to requesting this testimony generally under the doctrine of Dennis v. United States [13] for the purpose of impeachment of government witnesses, counsel also explicitly requested that he be provided with such portions of the grand jury testimony of Marsha Skeens and others, which contained statements exculpatory of appellant Xy-das, under the doctrine of the Brady [14] and Levin cases.[15] Although the Government generally opposed such disclosure, the trial judge undertook an in camera review of the grand jury testimony of these individuals in order to exclude therefrom extraneous matter, and references to certain names and matters still under investigation in other cases, or deserving of protection from adverse publicity, and to determine whether any exculpatory statements were contained therein. While portions of the grand jury testimony of some of these persons were provided to the defense, it does not appear that any portion of Marsha Skeens' testimony was revealed.[16] It is from this set of facts that the second major issue of this appeal arises.

Subsequent to the trial of this case, while appellant's counsel was engaged in the trial of a related case, he came across a portion of the grant jury testimony of Marsha Skeens in which she testified as follows:

> Well, when the furs were stolen, they had taken them to my house to begin with, and my neighbors were having a —you know, they watch me anyway. So they decided not to leave them there and they took them to Steve Xydas's sister or mother—somebody's—I don't know whether it was his sister's or his wife's garage.

13. 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966).

14. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

15. Levin v. Katzenbach, 124 U.S.App.D.C. 158, 363 F.2d 287 (1966), on appeal after remand, Levin v. Clark, 133 U.S.App. D.C. 6, 408 F.2d 1209 (1967). In a document filed in the trial court prior to trial the Government set forth its understanding of its duty to be that "Brady and Levin require that the Government disclose such evidence which in the context of the given case might lead the jury to entertain a reasonable doubt about the defendant's guilt." The Government then represented that it had examined its files and found nothing, not already disclosed, that was required to be provided to the defense under Brady and Levin.

16. Marsha Skeens was not called as a witness by the Government, and therefore, under the Dennis case, general discovery of her testimony was not available to the defense. See Allen v. United States, 129 U.S.App.D.C. 61, 390 F.2d 476 (1968). Apart from the requirements of Dennis, however, appellant was entitled to exculpatory information in the Government's possession, including any contained in the grand jury minutes, whether or not the witness testified at trial. For example, in the instant case, a portion of the grand jury testimony of James Skeens, which was of an exculpatory nature as to appellant's involvement in the offenses charged in the first two counts of the indictment, was provided to the defense prior to the trial, even though Skeens himself never testified at trial.

In considering the significance of this statement, it is first apparent that it is not an unequivocally exculpatory one. It does not state that Xydas was not contacted before the French Poodle burglary took place, nor does it negate the possibility that storage arrangements for the furs may have been made ahead of time with Xydas on an alternative basis. Rather, it ambiguously relates that the burglars "decided," at some unspecified time, not to leave the furs at Skeens' house and instead took them to Xydas's sister's. Nevertheless, the statement does suggest the possibility that the decision to involve Xydas was not taken until after the furs were already at Skeens' house in Maryland.

Granting, then, that the statement has some significance for the defense case, the question becomes whether it was sufficiently "favorable" to appellant that the failure of the prosecution to provide it was reversible error under Brady v. Maryland.[17] Or, alternatively, as the test has been stated in this Circuit, whether if the defense had been provided with the statement, it may have been able to secure evidence that "might have led the jury to entertain a reasonable doubt about [defendant's] guilt."[18] We have concluded that it would not. In the words of Judge McGowan's statement issued on denial of rehearing *en banc* in *Levin*, in which Judges Leventhal and Robinson concurred, we do not think the circumstances here reveal one of "those particular situations where a fair trial may have been significantly blurred by the Government's failure to comply with a request for information."[19]

In the first place, this case is distinguishable from *Levin*, in that there the defense did not learn the threshold information which would have served to stimulate its own inquiry into the subject upon which the prosecution failed to disclose information until after the trial was already in progress.[20] In Levin, the information withheld was the fact that two bank officials did not remember the money that was allegedly stolen having been brought to the bank and changed from thirty-five $1000 bills into bills of smaller denominations, as two of the key prosecution witnesses had testified to have occurred. The fact of this clearly demonstrated non-remembrance would have undermined seriously the prosecution's case, had it been presented to the jury. However, defense counsel was in no position to discover this information prior to trial, since he did not become aware of the "threshold" information that the bills were alleged to have been changed at all until well after the trial started. By contrast, in the instant case, not only was the withheld information of ambiguous significance, but also it clearly appears from the transcript that appellant's counsel was aware, prior to trial, both that the furs were first taken to the Skeens' house[21] and that Marsha Skeens "was privy to all * * * that happened."[22] Furthermore, there is nothing to indicate that Marsha Skeens was not

---

17. *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963).

18. Levin v. Clark, 133 U.S.App.D.C. 6, 9, 408 F.2d 1209, 1212 (1967).

19. *Id.*, 133 U.S.App.D.C., at 19, 408 F.2d, at 1222.

20. *Id.*, 133 U.S.App.D.C., at 11 n. 29, 22, 408 F.2d, at 1214 n. 29, 1225.

21. Indeed, as part of its preparation, the defense prepared a map showing the relative distances from the site of the French Poodle burglary to both Skeens' and Xydas' houses. This map was introduced into evidence as part of the defense case.

22. Tr. Vol. I, p. 39. Xydas' counsel had been one of the defense counsel in the prior *Wallace* trial, see note 4, *supra*, the transcript of which we take judicial notice, where Barnes, while testifying regarding the French Poodle burglary, had related that the furs were first taken to Skeens' house and that Marsha Skeens had actually been present at the French Poodle while the burglary was in progress.

available to be called as a defense witness; indeed the defense hinted that it might call her as a basis for requesting her grand jury testimony, but she was never called. And the issue on which the withheld information bore, whether Xydas was contacted before or after the transportation of the furs to Maryland, was not, as in *Levin*, one whose significance was hidden from the defense until well after trial began, but rather was part of the defense theory of the case from the beginning. With the foregoing in mind, we proceed to inquire into how lack of knowledge of Marsha Skeens' statement before the grand jury might have affected the defense's presentation of its case.

Given the defense's knowledge that the furs were initially taken to the Skeens' house, and that Marsha Skeens was "privy" to this, these, and only these, possibilities present themselves with respect to the nature of the defense's pretrial preparation:

1. The defense did not even attempt to interview Marsha Skeens.

2. An attempt was made by the defense to interview Marsha Skeens but she could not or would not provide them with any relevant information.

3. Marsha Skeens was interviewed by the defense and she either (a) confirmed the fact that Xydas was not contacted until after the furs had reached the Skeens' house, or (b) indicated that prior storage arrangements had in fact been made with Xydas.

Only in the first of these cases would the pre-trial knowledge of Marsha Skeens' grand jury statement have any effect whatsoever on the conduct of the defense's case. And in such a situation, given the defense's knowledge of the stop at the Skeens' household, and its already formulated theory of the case, failure to attempt to interview such a crucial witness [23] would represent such

slovenly pre-trial preparation that the lack of any testimony that Marsha Skeens might have supplied cannot reasonably be attributed to the prosecution's failure to disclose the information here in question. In other words, the most that pretrial knowledge of this particular grand jury testimony would have done, given the posture of the case and the information already in the hands of the defense, would have been to alert counsel of the importance of interviewing Marsha Skeens, something of which he clearly was already sufficiently aware.

■ We therefore hold that the failure of the prosecution to disclose the contested grand jury statement was not reversible error, since under the circumstances here reasonable pre-trial preparation by the defense would either have confirmed, denied, or rendered immaterial the latent implication in Marsha Skeens' testimony that appellant Xydas *may* not have made prior arrangement to store the furs. Given the facts of this and the related *Wallace* case, and appellant's counsel's demonstrated knowledge of those facts, that no direct proof along the lines of the possible implication in the grand jury testimony was introduced is the best indication such proof did not exist.

We have considered the remaining points urged by appellant as requiring reversal but find them without merit. The judgment of the trial court is therefore

Affirmed.

BAZELON, Chief Judge (concurring):

I concur in the Court's analysis of the issues in this case. Though the question of prejudicial error is very close for me, I agree that this conviction must be affirmed.

I would like to add, however, that I do think that Marsha Skeens' statement was sufficiently "favorable" to appellant

---

23. From the high caliber of the defense's presentation of its case, as evident in the record, we deem it highly unlikely that any such failure occurred. Rather, in all probability Marsha Skeens was interviewed on the very point at issue but failed to provide sufficient information to justify calling her as a witness.

so that its disclosure was required under the doctrines of *Brady* and *Dennis*. Granted that the statement may have been useful only to inform counsel that Marsha Skeens might be a critical witness, this is precisely the kind of lead which, in another case, might have had major consequences for counsel's trial strategy. Defense counsel are not blessed with an infinite amount of time in preparing criminal cases; therefore, leads from the grand jury minutes may often be of critical importance. We have held in Allen v. United States, 129 U.S.App.D.C. 61, 390 F.2d 476 (1968), that there must be clear and compelling considerations for denying to the defense access to the minutes—considerations bearing primarily upon whether there is any real need for secrecy. I agree with Judge Fahy, dissenting in Young v. United States, 132 U.S.App.D.C. 142, 406 F. 2d 960 (1968), that the rule should not be restricted to witnesses who testify at the trial.

I think this case indicates again the hazards of relying on the prosecutor and the trial judge to look after the defendant's interests.