United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 1, 1998 Decided July 21, 1999 

 No. 99-3096

 In re Sealed Case No. 99-3096 
 (Brady Obligations) 

 Appeal from the United States District Court 
 for the District of Columbia 

 Evelina J. Norwinski, Assistant Federal Public Defender, 
argued the cause for appellant. With her on the briefs was 
A.J. Kramer, Federal Public Defender. Reita P. Pendry, 
Chief Assistant Federal Public Defender, entered an appear-
ance.

 Chrisellen R. Kolb, Assistant U.S. Attorney, argued the 
cause for appellee. With her on the brief were Wilma A. 
Lewis, U.S. Attorney, and John R. Fisher, Assistant U.S. 
Attorney.

 Before: Edwards, Chief Judge, Henderson and Garland, 
Circuit Judges.

 Opinion for the Court filed by Circuit Judge Garland.

 Garland, Circuit Judge: The defendant in this criminal 
case contends that the government improperly denied his 
repeated requests for information to which he was entitled 
under Brady v. Maryland, 373 U.S. 83 (1963). The govern-
ment responds that because the information, if it exists, would 
relate to the impeachment of a defense witness, it falls 
outside the obligations imposed by Brady. Defendant replies 
that impeachment information always comes within the ambit 
of Brady, regardless whether the witness testifies for the 
defense or the prosecution.

 We need not accept either of these broad claims to resolve 
this case. The information defendant seeks would not merely 
be impeaching in the sense that it would weaken the credibili-
ty of his own witness. Rather, it would be exculpatory in the 
sense that it would be affirmatively favorable to his assertion 
of innocence. Accordingly, such information comes within the 
scope of the government's Brady obligations. Because the 
government concedes that it has not searched to determine 
whether the requested information exists, we grant the defen-
dant's request that the case be remanded to the district court. 
The government must first search to determine whether the 
information sought by defendant exists and, if it does, the 
district court must then determine whether that information 
is "material" within the meaning of Brady and its progeny.

 I

 In September 1996, an officer of the District of Columbia's 
Metropolitan Police Department (MPD) applied for a warrant 
to search the home of John Doe1 for a handgun and ammuni-
tion. The officer submitted an affidavit stating that an 
unidentified informant had observed the gun and ammunition 
there within the last 48 hours. The affidavit continued: "The 

__________
 1 Because this case remains under seal, the names of the defen-
dant and the informant have been changed.

source that provided this information has ... given informa-
tion which has led to the arrests of several subjects for 
narcotics violations, the recovery of one assault weapon, the 
arrests of subjects wanted on warrants and the issuance of 
two search warrants." Def. App. 11. A judge of the Superi-
or Court of the District of Columbia granted the application.

 The police executed the warrant the following morning. 
The officers found one semi-automatic handgun under the 
mattress in Doe's basement bedroom, and a second gun, 
along with ammunition, in a shoebox under the basement 
stairwell. Doe was arrested and questioned. He denied the 
guns were his, and denied knowing that they were in the 
house. He said he had seen one of the guns in the possession 
of a friend, Thomas Jones, a couple of days earlier. Def. 
App., Tab A at 51. Doe's girlfriend later testified that Doe 
and Jones had picked her up at the hospital the day before 
the search, and that after returning to Doe's house, Jones had 
spent some time in the basement alone. Id., Tab D at 29-30.

 Doe was charged with unlawful possession of a firearm and 
ammunition by a convicted felon, in violation of 18 U.S.C. 
s 922(g). In a pretrial motion filed in October 1996, Doe 
sought disclosure of the identity of the government's infor-
mant. Pursuant to Brady, he also sought production of 
information concerning, inter alia: (1) "the amount of money 
... paid to the source," and whether it was "paid in exchange 
for information or otherwise"; (2) "other consideration pro-
vided to the source, including ... assistance in avoiding or 
minimizing harm from pending or threatened charges"; (3) 
"all benefits, promises of benefits, or statements that the 
source would not benefit absent cooperation ... in connection 
with this case"; (4) "the nature of assistance that the source 
has provided in the past"; and (5) "the source's prior record, 
pending cases, and parole and probation status." Def. App. 
21. The court denied the request, ruling that defendant had 
not met the burden for piercing the government's informant 
privilege set forth in Roviaro v. United States, 353 U.S. 53 
(1957), because "it is basically a position of speculation as to 

how the informer in this case might be helpful to the defen-
dant ... as [the case] stands before the Court now...." 
Def. App., Tab A at 83.

 Shortly before Doe's trial was scheduled to begin, Thomas 
Jones called Doe's attorney, told her that he had helpful 
information, and asked to meet with her. In January 1997, 
the attorney, her investigator, and Jones met in a restaurant 
parking lot. According to the investigator's file memoran-
dum, Jones told them that he was the government informant 
in Doe's case and that "he wanted to clear his conscience." 
Def. App. 29. He said that "he had a big gun and drug case 
in [District of Columbia] Superior Court and he had to work 
it off," and identified three detectives with whom he was 
cooperating. Jones said the guns found in Doe's apartment 
were his (Jones'). He said that the day before the execution 
of the search warrant, he and Doe had gone to pick up Doe's 
girlfriend at the hospital. When they returned to the house, 
Jones continued, he "hid the guns, one under the mattress 
and one in a box under the stairs." He did not tell Doe he 
was hiding the guns, and Doe did not know what he had done. 
Jones assured Doe's attorney that he would testify at Doe's 
trial. At the same time, he asked for assistance with his own 
legal problems: there was an outstanding bench warrant for 
his arrest, and Jones feared that the police would incarcerate 
him at the District of Columbia's correctional facility at 
Lorton, Virginia. "I can't go back to Lorton," he said, 
"because I snitched on so many people." Id.

 Doe's trial began a week later. In her opening statement, 
Doe's attorney told the jury the evidence would show that 
Doe was innocent, and that Jones had planted the guns and 
ammunition in the house without Doe's knowledge. Def. 
App., Tab C at 12. Thereafter, Doe's attorney learned from 
the attorney in Jones' Superior Court case that Jones intend-
ed to invoke his Fifth Amendment privilege against self-
incrimination and would refuse to testify at Doe's trial. The 
next morning, Doe's attorney advised the court that, in order 
to get Jones' prior statements before the jury, she planned to 
introduce them through the testimony of her investigator as 

statements against Jones' penal interest, see Fed. R. Evid. 
804(b)(3). Def. App., Tab D at 3-4.

 At this point, the prosecutor questioned whether Jones 
really did have a Fifth Amendment privilege. After the court 
appointed a lawyer to advise Jones, Jones formally asserted 
his right not to testify. The prosecutor then asked "to speak 
with [Jones' lawyer] over the luncheon recess to see if we can 
reach some sort of accommodation ... which would permit 
him [Jones] to testify." Id. at 68. Doe's counsel then made a 
Brady request for Jones' "agreements with the government" 
in what she understood to be his "sealed" cases in Superior 
Court. Id. The prosecutor protested that "I don't have 
access to that information readily. I would have to go back 
to my office and try to pull out the old files and everything 
else." Id. The district court denied Doe's request as "pre-
mature," indicating that it did not want to decide the issue 
until it was determined that Jones would testify. Id. at 68-
69.

 After the luncheon recess, Jones agreed to testify and the 
government advised the court that it had agreed to make 
arrangements for his safety. Suspecting that Jones had 
become an adverse witness during the break, defense counsel 
again requested production of Jones' "prior agreements with 
the government" and "sealed" case records. The court again 
put off decision, this time indicating it would not consider the 
issue until after Jones testified. Def. App., Tab E at 11.

 Jones was then called to the witness stand by Doe's coun-
sel. Although he denied that he had told her the names of 
police officers with whom he was cooperating or that he was 
"working off" a conviction in Superior Court, id. at 22, 27, 
Jones admitted that he had told her he was the confidential 
informant in Doe's case, id. at 19. He also admitted to 
confessing that, while he was alone in the basement, he had 
planted the guns under the mattress and stairwell without 
Doe's knowledge. Id. at 19-21.

 On cross-examination by the prosecutor, Jones' story 
changed dramatically. He testified that his pre-trial state-

ments to Doe's counsel were lies. The guns, Jones said, were 
Doe's. The day before the search, Doe had taken them out 
from underneath the mattress and stairwell to show to him. 
Id. at 33-38. Jones had lied about planting the weapons, he 
said, because "some dudes" had "threatened, if I didn't call 
his lawyer, and tell the guns was mine some bodily harm 
would be done to me." Id. at 27-28. After hearing Jones' 
testimony, defense counsel asked the court to declare him a 
hostile witness and to permit her to cross-examine him. See 
Fed. R. Evid. 611(c). The court agreed. Def. App., Tab E at 
39.

 At the same time, however, the court rejected defendant's 
renewed request for "information regarding [Jones'] sealed 
cases" and "agreements he's made with the government 
regarding those cases." Id. The court denied the request 
regarding the sealed cases saying, "I'm not going to at this 
late juncture make any effort to get those sealed records 
from the Superior Court." Besides, the court said, any 
agreements reflected in the records of those cases "don't have 
anything to do with this case anyway." Id. at 42.

 Persistently, but tactfully, defense counsel asked that the 
court at least direct the government to turn over its own 
agreements with Jones, noting "[t]hat doesn't require any-
thing from Superior Court." Id. The prosecutor replied that 
there was no agreement in the instant case, but made no 
representation about agreements in other cases.2 She did 

__________
 2 In its brief before this court, the government states that it has 
"no reason to believe that any agreement existed between the 
United States Attorney's Office and Mr. [Jones] with respect to his 
case in Superior Court." Gov't Br. at 34 n.17 (citing, inter alia, 
Gov't App., Tabs A-F). We are confused by the government's 
statement since its citations, recently prepared transcripts of some 
of Jones' Superior Court appearances, appear to refer to such an 
agreement. See Gov't App., Tab C at 3 (statement by defense 
counsel that "[Jones] has been cooperating with providing informa-
tion"; reply by Assistant U.S. Attorney that "we will need to ensure 
that the agreement is followed through"); id., Tab E at 3 (state-
ment by court that at sentencing "[i]t was included in the represen-
tation by prosecution that the defendant was cooperating"). But 

state, however, that "I think there may be some records that 
the police might have [although] I certainly don't have any-
thing right now." More important, she continued, "I don't 
think the government has an obligation to produce them to 
the defense in connection with a defense witness." Id. The 
court agreed, ruling that the government was not required to 
produce records "in regard to a defense witness." Id. at 43. 
The court advised defense counsel that she was free, however, 
to question Jones about any agreements he might have. Id.

 Doe's counsel proceeded to do so, but Jones denied being a 
"snitch," id. at 50, said "I haven't told on anybody," id. at 53, 
and denied having "an agreement with the government," id. 
at 57-58. Doe's counsel did not impeach Jones or otherwise 
offer affirmative evidence of prior agreements or government 
cooperation. The jury convicted Doe of the offenses charged 
in the indictment, and the court sentenced him to 92 months 
in prison.

 II

 In Brady v. Maryland, the Supreme Court held that the 
Due Process Clause imposes upon the prosecution an obli-
gation to disclose "evidence favorable to the accused ... 
where the evidence is material either to guilt or to punish-
ment, irrespective of the good faith or bad faith of the 
prosecution." 373 U.S. at 87; see Pennsylvania v. Ritchie, 
480 U.S. 39, 57 (1987). In Giglio v. United States and United 
States v. Bagley, the Court held that "impeachment evidence 
... as well as exculpatory evidence, falls within the Brady 
rule." United States v. Bagley, 473 U.S. 667, 676 (1985) 
(quoting Giglio v. United States, 405 U.S. 150, 154 (1972)). 

__________
see id., Tab F at 7 (statement by prosecutor that "I have no 
information whether or not the defendant is cooperating"). It may 
be that the government regards the cooperation agreement referred 
to in these transcripts as one involving the police rather than the 
U.S. Attorney's Office. If that is the distinction the government is 
drawing, it is of no moment to its obligations under Brady. See 
Kyles v. Whitley, 514 U.S. 419, 437 (1995); United States v. Brooks, 
966 F.2d 1500, 1503 (D.C. Cir. 1992).

And in Kyles v. Whitley, the Court held that the rule includes 
evidence "known only to police investigators and not to the 
prosecutor." 514 U.S. 419, 438 (1995). Hence, to comply 
with Brady, "the individual prosecutor has a duty to learn of 
any favorable evidence known to others acting on the govern-
ment's behalf in the case, including the police." Id. at 437.

 As the Supreme Court recently noted in Strickler v. 
Greene, courts have used the term "Brady violation" to cover 
a multitude of prosecutorial sins involving breach of "the 
broad obligation to disclose exculpatory evidence," often 
called "Brady material." 119 S. Ct. 1936, 1948 (1999). These 
include both the failure to search for Brady material and the 
failure to produce it. "[S]trictly speaking," however, "there is 
never a real 'Brady violation' unless the nondisclosure was so 
serious that there is a reasonable probability that the sup-
pressed evidence would have produced a different verdict." 
Id. As the Court explained, a "true Brady violation" has 
three components: "The evidence at issue must be favorable 
to the accused, either because it is exculpatory, or because it 
is impeaching; that evidence must have been suppressed by 
the State, either willfully or inadvertently; and prejudice 
must have ensued." Id. To satisfy the prejudice component, 
the withheld evidence must be "material"; that is, there must 
be "a reasonable probability that, had the evidence been 
disclosed to the defense, the result of the proceeding would 
have been different." Id. (quoting Bagley, 473 U.S. at 676); 
see also Kyles, 514 U.S. at 433-34. If the undisclosed evi-
dence is material, a new trial is required. Kyles, 514 U.S. at 
421-22.

 It appears from the parties' briefs that, contrary to Doe's 
original understanding, the records of Jones' Superior Court 
cases3 were not sealed. Gov't Br. at 36 n.21; Oral Arg. Tr. 
14-15. Hence, Doe's request for access to those records is 
effectively moot. His request for the disclosure of agree-
ments between Jones and the government, however, remains 

__________
 3 Jones has convictions for carrying a pistol without a license, 
attempted possession with intent to distribute cocaine, and attempt-
ed distribution of cocaine. Gov't Br. at 6 n.7.

very much alive. The government's appellate brief advises us 
that Jones did "provid[e] information to the police as a paid 
special employee," Gov't Br. at 34 n.17, and its appendix 
discloses that Jones was required, as a condition of probation 
in one of his Superior Court cases, to cooperate with the 
police, see Gov't App., Tab C, at 3-4. At oral argument, the 
government also advised that "in candor with the court, it 
might involve the FBI, it might involve the DEA and other 
law enforcement agencies" as well. Oral Arg. Tr. at 29.

 We therefore proceed to examine the arguments asserted 
by the government in support of its contention that, even if 
cooperation agreements exist, it has no Brady obligation to 
produce them. We conduct this examination de novo, since 
whether the government has breached its obligations under 
Brady is a question of law. United States v. Cuffie, 80 F.3d 
514, 517 (D.C. Cir. 1996); United States v. Lloyd, 71 F.3d 408, 
411 (D.C. Cir. 1995).

 A

 At trial, the prosecutor argued and the court agreed that 
Brady did not apply because Jones was a defense witness. 
In response, the defendant points out that the Supreme 
Court's description of the government's Brady obligations 
encompasses evidence that can be used to impeach the credi-
bility of a witness, and does not on its face distinguish 
between impeachment of a prosecution witness and impeach-
ment of a witness for the defense.4 The government replies 
that the Court's references to impeachment in Bagley and 
Giglio involved prosecution witnesses (the same was true in 
Strickler), and that Brady and its progeny therefore do not 
require disclosure of impeachment evidence concerning a 
defense witness. "The Due Process Clause," the government 
notes, "does not provide 'a general constitutional right to 
discovery in a criminal case, and Brady did not create one.' " 
Gov't Br. at 17 (quoting Weatherford v. Bursey, 429 U.S. 545, 

__________
 4 See Kyles, 514 U.S. at 433 (noting that in Bagley "the Court 
disavowed any difference between exculpatory and impeachment 
evidence for Brady purposes").

559 (1977)). To require disclosure of potential impeachment 
regarding defense witnesses, the government argues, would 
effectively "displace the adversary system as the primary 
means by which the truth is uncovered"--a result not intend-
ed by Brady. See Bagley, 473 U.S. at 675; see also United 
States v. Agurs, 427 U.S. 97, 109, 112 n.20 (1976).

 In the usual case there is a conceptual difference between 
the impeachment of a government witness and the impeach-
ment of a defense witness. Evidence that impeaches the 
former is almost invariably "favorable" to the accused, be-
cause by making the government's case less credible it en-
hances the defendant's chances of acquittal. Evidence that 
impeaches a defense witness, by contrast, is not generally 
favorable to the accused; by reducing the credibility of the 
defendant's own witness, such impeachment reduces the prob-
ability that he will obtain a not guilty verdict. It is ordinarily 
the prosecutor rather than defense counsel who wants to use 
the latter kind of evidence--although she may prefer to delay 
its use (and disclosure) until after the witness testifies, both 
to prevent tailoring of the testimony in expectation of the 
cross-examination and to employ the element of surprise to 
expose the witness' mendacity.

 But Doe's is not the usual case involving impeachment of a 
defense witness. First, although it is true that defense 
counsel's original plan was to put Jones on the stand as her 
own witness (either directly or through the testimony of the 
investigator), had things gone as planned she would have had 
no reason to impeach Jones' credibility. It was only after 
Jones "flipped" and started testifying against Doe that de-
fense counsel wanted to impeach him, hoping that evidence of 
a cooperation agreement would help her do so by showing 
that Jones lied when he said he had never "snitched" on 
anyone. Hence, even if we were to accept the proposition 
that only the impeachment of a government witness falls 
within Brady, by the time Jones flipped he had effectively 
become a government witness--as the court recognized by 
declaring him hostile. See Kyles, 514 U.S. at 445-46 (order-
ing new trial where defense could have called informant as 

adverse witness and effectively used undisclosed evidence as 
impeachment).

 Second, and more important, the underlying reason Doe 
sought information about Jones' relationship with the govern-
ment was not to impeach Jones' statement, but to use it as 
affirmative evidence of Doe's own innocence. Indeed, if all 
had gone as planned, Doe would not have used evidence of a 
cooperation agreement to impeach Jones' statement that he 
planted the guns, but rather to corroborate it by exposing his 
motive for doing so. With the testimony of Doe's girlfriend 
that Jones had been alone in the basement, Doe had corrobo-
ration of Jones' opportunity to plant the weapons. What he 
needed was evidence of motive, and any of several kinds of 
cooperation agreements might have provided it. See Bagley, 
473 U.S. at 683 (stating that where "the possibility of a 
reward had been held out" to witnesses for providing useful 
information, "[t]his possibility ... gave [the witnesses] a 
direct, personal stake in respondent's conviction").5 For ex-
ample, if there were an agreement that the prosecution would 
seek the reduction of Jones' Superior Court sentences if he 
provided "substantial assistance in investigating or prosecut-
ing another person," see Fed. R. Crim. P. 35(b), that agree-
ment might have given him a motive to plant the guns. 
Similarly, if cooperation with the police were a condition of 
Jones' continued probation on his Superior Court convictions, 
that might have provided an incentive. And Jones might also 
have had a motive if the police had agreed to pay him in 
return for information leading to successful arrests.6 As 
noted above, there is evidence in the record that at least the 

__________
 5 Cf. Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986) (vacating 
judgment where court barred cross-examination about prosecutor's 
agreement to drop charge in exchange for witness' promise to speak 
with prosecutor, because "a jury might reasonably have found [it] 
furnished the witness a motive for favoring the prosecution").

 6 There is, of course, nothing inappropriate about such agree-
ments. See United States v. Ramsey, 165 F.3d 980, 988-90 (D.C. 
Cir. 1999) (noting legitimacy and law enforcement value of "prose-
cutorial promise(s) of leniency in exchange for truthful testimony"). 

latter two kinds of agreements may exist. See Gov't App., 
Tab C at 3-4 (Superior Court hearing transcript indicating 
cooperation with police was condition of Jones' probation); 
Gov't Br. at 34 n.17 (noting that Jones "provided information 
to the police as a paid special employee"); Oral Arg. Tr. at 29 
(noting that Jones may also have had arrangements with the 
FBI and DEA). By providing evidence of motive, such 
agreements would have been relevant to Doe's defense inde-
pendent of any impeachment value they might also have had 
once Jones turned on him.

 Finally, as the government conceded at oral argument, in 
the circumstances of this case an agreement that gave Jones 
a motive to plant the guns would be Brady material even if 
Jones never appeared as a witness for either side. Oral Arg. 
Tr. at 21, 27; see Kyles, 514 U.S. at 446; United States v. 
Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993). Indeed, in that 
respect this case is similar to Kyles, where the Supreme 
Court found that the prosecution violated Brady by failing to 
disclose evidence that an informant who never testified might 
have planted the murder weapon in defendant's apartment, 
514 U.S. at 453, including evidence of the informant's motive. 
See id. at 429 (noting defense theory that informant planted 
gun for purposes of "removing an impediment to romance 
with [Kyles' common-law wife] ... and obtaining reward 
money" from police). That kind of evidence is exculpatory in 
the purest sense, and its relevance does not depend on who 
sponsors its admission. Indeed, once Doe's girlfriend testi-
fied that Jones had been alone in the basement, evidence of 
an agreement giving Jones a motive to plant the guns would 
have been admissible (assuming authentication) even if Jones 
had never entered the courtroom. Accordingly, the fact that 

__________
And we certainly do not suggest that any such agreement would, or 
could, have authorized Jones to plant the guns. Rather, the point is 
simply that such an agreement may give a person a motive that the 
jury must be permitted to evaluate. See Van Arsdall, 475 U.S. at 
679; Bagley, 473 U.S. at 683; Giglio, 405 U.S. at 154-55; United 
States v. Smith, 77 F.3d 511, 513 (D.C. Cir. 1996).

Jones was originally proffered as a defense witness has no 
consequence for the scope of the government's Brady obli-
gations here.

 B

 The potpourri of other objections to disclosure argued by 
the trial prosecutor and sustained by the trial court are also 
unpersuasive. The court's original rejection of the defen-
dant's pretrial Brady motion correctly rested on the ground 
that, as matters then stood, the informant's identity was 
confidential and "how the informer in this case might be 
helpful to the defendant" was speculative. Def. App., Tab A 
at 83. See United States v. Mangum, 100 F.3d 164, 172 (D.C. 
Cir. 1996) (upholding nondisclosure of confidential informant's 
identity where defendant's assertion that informant planted 
gun in knapsack was "purely speculative" and there was no 
evidence informant had access to knapsack); United States v. 
Warren, 42 F.3d 647, 654 (D.C. Cir. 1994) ("Speculation as to 
the information the informant may provide is insufficient."). 
By the time the case went to trial, however, those factors no 
longer applied. Jones had voluntarily revealed himself to 
defense counsel, and had told her he planted the evidence in 
Doe's basement. He had also told her that he was cooperat-
ing with the police in order to work off the gun and drug case 
he had in Superior Court. This, together with the statement 
in the affidavit for the search warrant that the informant had 
previously "given information which has led to the arrests of 
several subjects," Def. App. 11, moved the possibility that a 
materially relevant cooperation agreement existed far beyond 
the realm of speculation. See generally Roviaro, 353 U.S. at 
60-65.

 Nor is there any basis for the rulings that production of the 
requested information was "premature," first until it was 
clear Jones would testify, and then until after Jones actually 
did testify. Contrary to the prosecution's contention, the 
information did not become relevant only after Jones changed 
his story, giving the defense reason to impeach him. As 
noted above, evidence of Jones' motive was relevant indepen-
dent of when or whether he testified. Similarly, we reject the 

government's suggestion that ordering a Brady search before 
Jones testified would somehow have been inconsistent with 
our admonitions in United States v. Marshall (made with 
reference to Fed. R. Crim. P. 16), that "[t]o give rise to a 
disclosure obligation, the evidence's materiality must, of 
course, be evident to a reasonable prosecutor," and that the 
"prosecutor need not guess that evidence may become materi-
al as a consequence of a defendant's not-yet-revealed strate-
gic decisions." 132 F.3d. 63, 69 n.2 (D.C. Cir. 1998). At least 
from the moment defense counsel made the claim in her 
opening statement that Jones planted the guns, it was clear 
that any motive Jones might have had to do so was relevant 
to the case. No clairvoyance on the part of the prosecutor 
was required.

 We also reject the government's Catch-22 rationale that 
once Jones did testify, it was by then too late to compel 
production of the information, since doing so would have 
required a continuance to gather the materials. The govern-
ment protests that "in the midst of the trial" it should not 
have been required to "scamper" about searching for the 
requested evidence. Gov't Br. at 32. But that problem could 
have been avoided had the government gathered the material 
earlier. In light of the defendant's opening statement, it was 
no excuse the next morning that the prosecutor did not "have 
access to that information readily" and "would have to go 
back to my office and try to pull out old files and everything 
else." Def. App., Tab D at 68. The same was true that 
afternoon, when she said, "I think there may be some records 
that the police might have [but] I certainly don't have any-
thing right now." Id., Tab E at 42. And we do not under-
stand the basis for the government's argument that "appel-
lant cannot credibly complain because he failed to assert a 
timely demand for this impeachment material." Gov't Br. at 
40. To the contrary, defendant made his demands known 
early, often, insistently, and with specificity--only to be met 
with the government's claims that they were first premature, 
and then too late. If by the time Jones testified the govern-

ment still needed to "scamper" to collect the requested Brady 
material, it had no one to blame but itself.7

 We find equally unfounded the argument that any agree-
ments Jones may have had in his Superior Court cases "don't 
have anything to do with this case." Def. App., Tab E at 42. 
Defendant's whole point was that Jones may have planted the 
gun in this case in order to "work off" obligations that arose 
in those Superior Court cases. Hence, agreements in the 
other cases have everything to do with this case. Nor does it 
matter that agreements in other cases may have involved 
other prosecutors. The United States Attorney's Office for 
the District of Columbia prosecutes cases in both the federal 
District Court and the local Superior Court, and the prosecu-
tor is responsible (at a minimum) for all Brady information in 
the possession of that office. See Giglio, 405 U.S. at 154 
(holding that ignorance by one prosecutor of promise made by 
another is irrelevant since "[t]he prosecutor's office is an 
entity and ... [a] promise made by one attorney must be 
attributed, for these purposes, to the Government").

 For a similar reason, we reject as irrelevant the contention 
that the requested records may have been in the possession 
of the Metropolitan Police Department, or the FBI or DEA, 
rather than the U.S. Attorney's Office. As the Supreme 
Court held in Kyles, "[t]he individual prosecutor has a duty to 
learn of any favorable evidence known to the others acting on 
the government's behalf in the case, including the police." 514 
U.S. at 437. Anticipating Kyles, we specifically held in 
United States v. Brooks that prosecutors in this District are 
responsible for disclosing Brady information contained in 

__________
 7 Indeed, the government knew from the opening bell that it 
would at least have to prepare to conduct its own cross-examination 
of Jones. See Def. App., Tab B at 15 (listing defendant's potential 
witnesses). Hence, it should not have needed the compulsion of 
Brady to learn all it could about him. See Brooks, 966 F.2d at 
1502-03 (noting that "prosecutor's own interest in avoiding surprise 
at trial gives him a very considerable incentive to search accessible 
files").

MPD files, "[g]iven the close working relationship between 
the Washington metropolitan police and the U.S. Attorney for 
the District of Columbia (who prosecutes both federal and 
District crimes, in both the federal and Superior courts)." 
966 F.2d 1500, 1503 (D.C. Cir. 1992). The same is true for 
files of the FBI and DEA which, like the U.S. Attorney's 
Office, are components of the U.S. Department of Justice. 
See id. (noting that Brady requires prosecutors to search FBI 
records).

 C

 Next, we consider the government's appellate argument 
that it did not breach a disclosure obligation with respect to 
Jones' cooperation agreements because that information was 
otherwise available through "reasonable pre-trial preparation 
by the defense." Xydas v. United States, 445 F.2d 660, 668 
(D.C. Cir. 1971). We note at the start that we find this 
argument somewhat surprising. The government concedes 
that it has not yet conducted a full Brady search of its own, 
and hence does not know the details of any agreements Jones 
may have had. See Oral Arg. Tr. at 22-24, 29-30, 38-39. In 
particular, the government advises that it knows nothing of 
his arrangements with the MPD other than that Jones was a 
"paid special employee," Gov't Br. at 34 n.17; Oral Arg. Tr. at 
29, and nothing at all of any arrangements he may have with 
the FBI or DEA, Oral Arg. Tr. at 38-39. We do not 
understand how the government can confidently assert that 
defense counsel could have learned the contents of Jones' 
agreements when the government concedes that it has no 
idea what those contents are.

 According to the U.S. Attorney, the first place the defen-
dant should have turned for information about Jones' agree-
ments was Jones himself. Jones, the government points out, 
voluntarily contacted defense counsel and "was, for a time, 
cooperative with the defense." Gov't Br. at 32. "Since 
defense counsel had an opportunity to probe [Jones'] relation-
ship with the government ... during their January ... 
conversation [in the restaurant parking lot], appellant cannot 

now use Brady as a vehicle to get answers to questions left 
unasked at that time." Id. at 33. Again, we find this 
argument surprising. The government's position at trial was 
that virtually everything Jones said to defense counsel at the 
January meeting was a lie, a position the government main-
tains on appeal. Oral Arg. Tr. at 26-27. Surely information 
obtained from a government-certified liar cannot substitute 
for information obtained from the government itself--particu-
larly not when the defense was seeking information from a 
more trustworthy source in order to corroborate (or, as 
became necessary, impeach) that individual.

 Second, the government contends that if Doe wanted to 
learn of Jones' agreements with the MPD, he should have 
subpoenaed the involved officers themselves. Gov't Br. at 33. 
This argument, too, is unpersuasive. As we have noted 
above, "the prosecutor is responsible for 'any favorable evi-
dence known to the others acting on the government's behalf 
in the case, including the police,' " Strickler, 119 S. Ct. at 
1945 n.12 (quoting Kyles, 514 U.S. at 437), and particularly 
including the MPD, see Brooks, 966 F.2d at 1503. According-
ly, defense counsel was no more required to subpoena the 
officers to learn of their agreements, than she was to subpoe-
na the prosecutor to learn of hers. The appropriate way for 
defense counsel to obtain such information was to make a 
Brady request of the prosecutor, just as she did. See United 
States v. Iverson, 648 F.2d 737, 739 (D.C. Cir. 1981) (holding 
that "the primary obligation for the disclosure of matters 
which are essentially in the prosecutorial domain lies with the 
government"). Indeed, at oral argument the government 
agreed that had Jones been a government witness, it would 
readily have produced his cooperation agreements without 
insisting on a subpoena, Oral Arg. Tr. at 32-33, just as Giglio 
and Bagley contemplate. Since Jones' status as a defense 
witness is irrelevant here, there is no reason to require any 
other procedure.

 D

 Finally, the government argues that Doe was not preju-
diced by any nondisclosure that may have occurred because 

Doe's attorney failed to impeach Jones with the information 
she did have in her possession. When Jones denied under 
oath that he had ever informed on anyone else, Def. App., 
Tab E at 53 ("I haven't told on anybody"), counsel could have 
contradicted him with the sworn affidavit attached to the 
search warrant application, Def. App. 12 ("The source has 
given information which has led to the arrests of several 
subjects"). She might also have tried to use a representation 
made by Jones' attorney at the bench almost immediately 
after Jones made his denial. Id., Tab E at 61 (advising the 
court that there "was a stipulation of [Jones'] probation to 
assist the police on the street"). Defense counsel did not 
attempt to use either one.

 There is no doubt that this argument is relevant to the 
ultimate question of the materiality of the undisclosed evi-
dence, that is, whether there was "a reasonable probability 
that, had the evidence been disclosed to the defense, the 
result of the proceeding would have been different." Strick-
ler, 119 S. Ct. at 1948 (quoting Bagley, 473 U.S. at 682). But 
an evaluation of the significance of the evidence that was 
available to the defense cannot begin until the government 
determines whether there was any evidence that was unavail-
able. If the information the government finds about Jones' 
agreements is the equivalent of that which the defense al-
ready had, then it may well not be material for Brady 
purposes. See Iverson, 648 F.2d at 738 ("[N]o violation of 
due process results from prosecutorial nondisclosure if de-
fense counsel both knows of the information and is able to 
make use of it but still chooses, for tactical reasons, not to do 
so.").

 On the other hand, the evidence that was available to Doe 
only indicated that Jones had cooperated with the govern-
ment, and perhaps that he had an agreement to do so. It did 
not disclose, at least not explicitly, the terms of any such 
agreement and whether they gave Jones a motive to plant the 
guns in Doe's house. The latter would not have been the 
equivalent of what the defense already knew and, depending 
on the other facts in the case, may or may not have been 
material for Brady purposes. See United States v. Smith, 77 

F.3d 511, 512-13 (D.C. Cir. 1996) (holding that although 
aspects of witness' plea agreement were known to defense, 
undisclosed elements were material to defendant's ability to 
impeach); Cuffie, 80 F.3d at 517-18 ("[T]he fact that other 
impeachment evidence was available to defense counsel does 
not [necessarily] render additional impeachment evidence im-
material.") (internal quotations and citations omitted). Need-
less to say, until we know whether such information exists, we 
are unable to determine whether it would have been material. 
See Pennsylvania v. Ritchie, 480 U.S. at 57 ("At this stage, of 
course, it is impossible to say whether any information in the 
... records may be relevant to [defendant's] claim of inno-
cence, because neither the prosecution nor defense counsel 
has seen the information....").

 III

 The government concedes that it never conducted a full-
fledged Brady search with respect to any agreements its 
various components may have had with Jones. See Oral Arg. 
Tr. at 23-24, 29-30, 38-39. For the reasons stated above, 
that failure constituted a breach of the government's "duty to 
search" for Brady information. Brooks, 996 F.2d at 1502-03. 
In their arguments before this court, both the government 
and the defendant agreed that were we to find such a breach 
of the obligation to search, the proper disposition would be to 
remand this case to the district court, "to conduct a further 
evidentiary hearing to resolve whether there exists any Bra-
dy information and whether such information was material." 
Gov't Br. at 18 n.11; see Def. Br. at 20.

 This is the course we have followed in other cases, see 
Brooks, 966 F.2d at 1504-05; United States v. Lloyd, 992 
F.2d at 352, and the course we follow here as well. "On 
remand, the district court should require the U.S. Attorney's 
[O]ffice to do what it should have done earlier," 966 F.2d at 
1504, namely, to review information held by that office, as 
well as the MPD and other relevant law enforcement agen-
cies, to determine whether the government has or had any 

agreements with its informant of the kind discussed in this 
opinion. If the government finds that such agreements exist, 
the district court must then determine whether there is "a 
reasonable probability that, had the evidence been disclosed 
to the defense, the result of the proceeding would have been 
different." Strickler, 119 S. Ct. at 1948 (quoting Bagley, 473 
U.S. at 682).